PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Hall’s conviction and sentence.
OVERVIEW
Enoch D. Hall was convicted of the first-degree murder of Officer Donna Fitzgerald. Fitzgerald’s body was found in the paint room at Tomoka Correctional Institute (TCI). She had been stabbed, strangled by ligature, and suffered blunt force trauma to her head. Hall, an inmate at TCI, was apprehended by TCI personnel. Hall continued to repeat “I freaked out. I snapped. I killed her.” Hall was indicted by a grand jury for the murder. A jury returned a verdict of guilty of first-degree murder and recommended that Hall be sentenced to death by a unanimous vote. This is Hall’s direct appeal.
FACTS AND PROCEDURAL HISTORY
On July 10, 2008, Enoch Hall was indicted by the grand jury for the murder of Florida Department of Corrections Officer Donna Fitzgerald. Hall was an inmate at TCI, who worked as a welder in the Prison Rehabilitative Industries and Diversified Enterprises, Inc. (PRIDE) compound,[1] where inmates work refurbishing vehicles. Sergeant Suzanne Webster was working as the TCI control room supervisor, where she was responsible for getting a count from all areas of the prison as to the number of inmates in each area. When Webster had not heard from Fitzgerald, who was working in the PRIDE compound that night, Webster radioed Officer Chad Weber, who went to the PRIDE facility with Sergeant Bruce MacNeil to search for Fitzgerald. Weber saw Hall run through an open door on the other end of one of the PRIDE buildings and Weber and Mac-Neil pursued Hall. Weber caught up to Hall, who repeatedly stated “I freaked out. I snapped. I killed her.” Hall responded to Weber’s commands and placed his hands on the wall and was handcuffed. Weber took possession of the PRIDE keys that Hall had in his hands. Officer Chad Birch shouted from inside the building, “Officer down!” and Hall remained outside with other officers while Captain Shannon Wiggins and Officers Weber and MacNeil entered the building and located Fitzgerald’s body. Fitzgerald’s body was found lying face down on top of a cart in the paint room. The upper part of her body was wrapped in gray wool blankets, and the bottom half of her body came over the back of the cart, with her pants and underwear pulled down to her knees. Inside a bucket of water that was on the floor next to Fitzgerald’s legs was Hall’s bloody T-shirt. Hall was escorted to the medical facility (MTC) of the prison by Officers Brian Dickerson and Gary Schweit. Several officers took turns watching Hall while he sat in the MTC. Hall was later escorted to a conference room to talk with investigators from the Florida Department of Law Enforcement (FDLE) and then to *268 a cell. Hall gave three statements to FDLE agents throughout the night regarding the events of the murder.

Guilt Phase

A jury trial commenced on October 12, 2009. Daniel Radcliffe, a crime scene investigator for FDLE, testified that he found two packets of pills in a file cabinet in the paint room of PRIDE where the body was discovered. The pill packets had an inmate’s name on them, Franklin Prince, and were labeled Ibuprofen 800 milligrams and Carbamazepine, a generic equivalent of Tegretol, 200 milligrams, an anti-seizure medication. Hall’s white T-shirt was found in a bucket of water with other shirts in the paint room, and Hall’s pants were found in a pile of clothes, also in the paint room. Months later, Hall’s blue prison shirt was found lodged on top of a paint booth. Granules of Speedy Dry, an oil absorbent material, were found on the ground in front of the welding shed and in a coffee can next to the shed. The granules tested positive for blood and DNA testing confirmed that it was Fitzgerald’s. A broom found nearby had Fitzgerald’s blood on the broom head. Blood was found on the walls of the welding shed. Also found in the welding shed was a cap, which had Fitzgerald’s blood on it. Hall’s clothes, including his underwear, tested positive for Fitzgerald’s blood. A sexual assault analysis was performed on Fitzgerald’s body. Jillian White, a crime lab analyst with the FDLE, testified that there was no evidence of semen on the body. Wiggins testified that he was a commander of the TCI rapid response team and as part of his job would search prisons for weapons. Wiggins testified that shanks made in the PRIDE facility differed from the usual ones made by inmates in that they had a machined edge made by a grinder. Wiggins testified that the shank recovered from the wall of the paint room which appeared to be the murder weapon had a meticulously sharpened point like those made from a tool grinder in the PRIDE facility.
The State played the three confessions Hall made on the night of the murder. In the first statement, given to FDLE agents and TCI personnel, Hall admitted to killing Fitzgerald and stated that he had taken four pills that Frank Prince, another inmate working in PRIDE, had given to him. Later that day, when his shift ended, Hall went looking for more pills, but was unable to find any and became angry. Officer Fitzgerald came in and laughed and called Hall by his nickname, “Possum, come on, get out of there.” Hall told her to get out. Fitzgerald grabbed Hall’s arm and he “freaked out” and began to stab her with a sharp piece of metal that he found on the floor of the room. Hall then took off his bloody shirt, put it in a bucket of water, and put on one of Prince’s shirts. He picked up the PRIDE keys and continued to look for pills. Hall stated that he did not remember pulling Fitzgerald’s pants down. Hall said that he did not want to have sex with Fitzgerald. Hall repeatedly stated that he just wanted to get high.
The second statement, given at about 1:30 a.m., was taken by Agent Stephen Miller of the FDLE upon Hall’s request in the cell in which Hall had been placed. During this interview, Hall admitted that he killed Fitzgerald somewhere other than the room where she was found. Fitzgerald found Hall searching for pills in the office. He ran out past her, she chased him to the welding shed, and he stabbed her there. Hall carried her to the office and placed her on the cart. Hall said he threw some dirt on the blood outside the welding shed. Hall told Miller that he hid the knife in a cinderblock wall near the welding shed. Hall also told Miller he did *269 not think he was “going to make it to tomorrow.” Miller told Hall that he would transport him to the branch jail in a little while.
The third statement was given at about 3:30 a.m. and was made only to the FDLE agents. In this third statement, Hall agreed that in his first statement he said he killed Fitzgerald inside the PRIDE building, but in his second statement he admitted to killing her in the welding area outside the PRIDE building. Hall admitted that he stayed behind in the PRIDE compound to look for drugs. While looking for drugs, Hall found the shank by the sink in Prince’s office and took it with him. When he realized Fitzgerald was looking for him, Hall hid inside the welding shed. Fitzgerald opened the shed door and came in and tried to grab him. He tried to run past her, but she would not let go, so he stabbed her. Hall did not recall how many times he stabbed her, but said he stabbed her enough times “just to get by.” Fitzgerald fell to the ground inside the shed; he did not know whether or not she was alive. He hid the shank in the wall and spread some Speedy Dry on the ground in the welding area to soak up the blood. Hall wrapped her up in a towel and blankets and carried her back to the paint room/office. Hall placed her on a cart. He then continued to look for pills, but was not able to find any. Hall went back to the room where Fitzgerald was and pulled down her pants. He did not sexually assault her. Hall said he put his shirt in a bucket of water, put on Prince’s shirt, but kept on his own pants. Corrections officers entered the PRIDE facility and he attempted to run from them.
Dr. Predrag Bulic, the Volusia County associate medical examiner, testified for the State about the injuries Fitzgerald sustained based on her autopsy results. He testified that Fitzgerald’s body bore evidence of blunt force injuries, mostly on her face, consistent with those caused by punches from a hand. Fitzgerald’s hands and arms had sustained defensive wounds caused by a sharp instrument consistent with a knife. Fifteen additional stab wounds were inflicted upon Fitzgerald, including on her stomach, back, and chest. Dr. Bulic also testified that a gold chain necklace on Fitzgerald’s body had been pulled tightly around her mouth and neck from behind in a manner so as to exert sufficient force to leave a postmortem mark consistent with ligation. On October 23, 2009, Hall was convicted of first-degree murder.

Penalty Phase

The penalty phase commenced on October 27, 2009. The defense renewed its previously argued motion to preclude the State from offering evidence of the length of Hall’s sentences he was serving when he killed Fitzgerald. The trial court denied the motion and the State offered evidence that Hall was serving two consecutive life sentences when he murdered Fitzgerald.
The State also offered evidence that Hall had committed prior violent felonies, introducing testimony from two women whom Hall had raped. The defense objected to the testimony of the two women as highly prejudicial and irrelevant. The trial court overruled the objection and allowed the testimonies.
Victim impact statements were published for the jury. Donald and Dana Shure, Officer Fitzgerald’s younger brother and sister, prepared written statements and read them to the jury. Joanne Dunn, Fitzgerald’s mother, also read a statement to the jury.
The defense presented several witnesses during the penalty phase to support mitigation. James Hall, Hall’s father, testified that Hall was a good son and got along well with his two younger brothers. He *270 also testified that Hall had been raped in jail at age 19, when his girlfriend’s mother’s boyfriend, a law enforcement officer, arranged to have him put in jail after a dispute. After his release, Hall became afraid and mostly stayed home, and he eventually started living in a shelter in the woods. James Hall had not seen his son since 1995. Hall’s mother, Betty Hall, also testified regarding her son’s love for sports growing up. Dr. Reid Hines, a dentist, testified telephonically that he and Hall had played sports together in high school and that Hall was an excellent athlete. Bruce Hall, the former plant manager for PRIDE, testified that Hall started at PRIDE as an apprentice welder and eventually worked his way up to lead welder. Rodney Callahan, an inmate who used to work with Hall, described him as a very good worker, conscientious, and responsible.
Dr. Daniel Buffington, a pharmacologist, testified for the defense that, among other possible side effects, both Ibuprofen and Tegretol have the capacity to alter someone’s behavior. The State called Dr. Wade Myers on rebuttal, who testified that most people who take an overdose of Ibuprofen do not have any side effects and the remaining people typically complain of nausea, and that Tegretol has an anti-aggression component to it, and, in his opinion, it “would be very unlikely” to cause aggression — “You’re going to get the opposite effect.”
The jury returned a recommendation of death by a unanimous vote.
Spencer[2] Hearing
In support of the defense’s contention that Hall should receive the emotionally and mentally disturbed statutory miti-gator, Dr. Harry Krop testified for the defense that Hall had a cognitive disorder, not otherwise specified, coercive paraphilia disorder-multiple sexual offender, and an alcohol substance abuse disorder. Krop testified that Hall had a serious emotional disorder at the time of the offense and that Hall’s ingestion of Tegretol could bring out his underlying psychological traits.
The State offered rebuttal testimony from Dr. William Riebsame, a forensic psychologist and professor of psychology, and Dr. Jeffery Danziger, a board certified forensic psychiatrist. Riebsame testified that the results of the tests administered to Hall by Krop were questionable, because Krop failed to test for malingering. Danziger testified that he administered two tests to determine whether Hall was mentally ill or was malingering. A score of more than 14 is highly correlated with malingering and Hall’s score was 29. Danziger arrived at the opinion that Hall has a history of substance abuse, adult anti-social behavior, history of sexually-related charges, possible psychosexual disorder, and pseudo-seizure disorder by history. Danziger strongly disagreed with any attempt by Buffington to diagnose a psychological condition and disagreed with Buffington’s opinion that Tegretol could unmask an underlying psychological illness. The trial court found that Hall did not establish the existence of mental or emotional disturbance as a statutory mitigating circumstance and gave it no weight.
In the trial court’s Sentencing Order, the court found five aggravates: (1) previously convicted of a felony and under sentence of imprisonment — great weight; (2) previously convicted of another capital felony or of a felony involving the use or threat of violence to the person — great weight; (3) committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws — great *271 weight; (4) especially heinous, atrocious or cruel — very great weight; (5) cold, calculated, and premeditated — -very great weight; (6) the victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties — no weight — merged with aggravated number 3 as listed above. In mitigation, the sentencing court found no statutory mitigators and eight non-statutory mitigating circumstances: (1) Hall was a good son and brother — some weight; (2) Hall’s family loves him — little weight; (3) Hall was a good athlete who won awards and medals — little weight; (4) Hall was a victim of sexual abuse — some weight; (5) Hall was productively employed while in prison — some weight; (6) Hall cooperated with law enforcement — some weight; (7) Hall showed remorse — little weight; and (8) Hall displayed appropriate courtroom behavior — little weight. The trial court concluded that the aggravating circumstances far outweighed the mitigation and gave great weight to the jury’s unanimous recommendation of death. Thus, the trial court imposed the sentence of death. This direct appeal followed.
Hall raises six issues: (1) whether the trial court properly denied Hall’s motion to suppress his confessions; (2) whether the trial court erred by admitting opinion testimony of the medical examiner regarding the sequence of wounds and the position of the victim; (3) whether the trial court erred in admitting prior crime evidence during the penalty phase; (4) whether the trial court erred in admitting evidence of non-statutory aggravating circumstances; (5) whether the death sentence is proportionate; and (6) whether Florida’s death sentencing scheme is unconstitutional under Ring.[3] Additionally, we review the sufficiency of the evidence to support Hall’s conviction.
ANALYSIS

Hall’s Confessions

Hall contends that the trial court failed to properly apply the totality of the circumstances test in determining that Hall’s three confessions to FDLE were voluntary. We disagree. Both the United States and Florida Constitutions provide that persons shall not be compelled to be witnesses against themselves in any criminal matter. U.S. Const. Amend. V; art. I § 9, Fla. Const. Based on these constitutional guarantees, where a defendant confesses during a custodial interrogation, the State must prove that the confession was voluntarily made for the confession to be admissible in a criminal trial. See Ramirez v. State, 739 So.2d 568, 573 (Fla.1999); Miranda v. Arizona, 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As we have recognized, “confessions must be free and voluntary and cannot be extracted by threats of violence or direct or implied promises.” Anderson v. State, 863 So.2d 169, 183 (Fla.2003). Once it is established that there were coercive influences attendant upon an initial confession, the coercion is presumed to continue “unless clearly shown to have been removed prior to a subsequent confession.” State v. Outten, 206 So.2d 392, 396 (Fla.1968). The test for determining whether a later confession is tainted by an earlier coerced confession is whether, given the totality of the circumstances, there is a “sufficiently isolating break in the stream of events.” Leon v. Wainwright, 734 F.2d 770, 772 (11th Cir.1984). The focus of the inquiry is whether the improper influences have been removed. Brewer v. State, 386 So.2d 232, 236-37 (Fla.1980). In reviewing a trial court’s ruling on a motion to suppress, an appellate court accepts a trial court’s *272 findings so long as they are supported by competent, substantial evidence. Thomas v. State, 894 So.2d 126, 136 (Fla.2004). However, a trial court’s application of the law to the historical facts is reviewed de novo. Cuervo v. State, 967 So.2d 155, 160 (Fla.2007); Connor v. State, 803 So.2d 598, 608 (Fla.2001).
The record indicates that the trial court took into account all the facts surrounding Hall’s confessions and thus applied the correct rule of law. In Hall’s motion to suppress, Hall alleged that his statements to investigators from the FDLE were involuntary because he was beaten by Department of Corrections’ personnel at TCI while being detained during the investigation surrounding Fitzgerald’s death. An extensive pretrial hearing regarding Hall’s motion to suppress was held on September 9, 2009. The State presented twelve witnesses[4] during the suppression hearing, all of whom testified that Hall was never threatened or physically abused during his detainment after Fitzgerald’s death. Hall was the sole witness who contradicted the other witnesses, testifying that he was hit and threatened by TCI personnel. The trial court specifically found that Hall was arrested without incident and was taken to the MTC and seated on a bench, where there was a “constant videotape recording made of [Hall] that reveals no obvious sign of abuse or injury.” The trial court found that Hall never told Miller of the FDLE that he was afraid or that he had suffered from any type of threat or physical abuse during the entirety of Hall’s three confessions to Miller. The trial court found that Hall’s testimony of his alleged abuse was refuted by every other witness at the suppression hearing. Thus, the trial court found “the state’s witnesses more credible under all the circumstances presented at hearing.” See Johnson v. State, 696 So.2d 326, 330 (Fla.1997) (where defendant’s testimony conflicted with every State witness at the hearing, the State proved the statement was voluntary and not induced by official coercion). The trial court went on to note that even if abuse by TCI personnel had occurred, Hall was not attempting to suppress his statements to TCI corrections officers that “I snapped. I killed her.” Rather, Hall was only attempting to suppress his statements to Miller of the FDLE, who was not part of the TCI personnel and was never alleged to have abused or threatened Hall. Furthermore, the trial court found that Hall requested the second interview with Miller and agreed to the third interview. The trial court thus found that if any abuse by the TCI officers had occurred, Hall “no longer was subject to the effects of such abuse when in the custody of the FDLE officers” and Miller. The record shows that the trial court took into consideration all of the pertinent facts elicited by all witnesses during the suppression hearing in finding that Hall’s confessions were voluntary. Therefore, Hall’s claim that the trial court failed to consider the totality of the circumstances is without merit.
The record also indicates that the trial court’s findings of fact are supported by competent, substantial evidence. Two photographs of Hall’s swollen eye in the record are troubling in consideration of Hall’s claims that TCI personnel abused *273 him during his detainment after Fitzgerald’s murder, along with Hall’s statement to Miller that he didn’t think he would make it to the next morning. However, the trial court found Hall’s bruise could have come from his struggle with Fitzgerald, noting that despite Hall’s opportunities, he never told Miller or anyone else outside TCI about the abuse until the suppression hearing. Thus, except for Hall’s testimony at the suppression hearing, there is no evidence that Hall was abused by the TCI officers. Without further evidence in the record to contradict the court’s finding, along with twelve witnesses’ unwavering testimonies that Hall was not abused by the TCI corrections officers, the trial court’s factual findings are supported by competent, substantial evidence. Accordingly, we deny relief on this claim.

Testimony of Dr. Bulic

Hall alleges that the trial court reversibly erred in allowing Dr. Bulic, the medical examiner, to testify regarding the possible sequence of Fitzgerald’s wounds. Hall contends that this error misled the jury to find Hall guilty of first-degree rather than second-degree murder and the trial court to find the heinous, atrocious, and cruel aggravator. However, aside from these conclusory allegations, Hall fails to show how the alleged error misled the jury either as to the conviction or its recommendation as to punishment.
Hall objects to a very small portion of Dr. Bulic’s testimony regarding the possible sequencing of the injuries. Prior to this testimony, however, Dr. Bulic testified in detail regarding all of the injuries suffered by the victim, most of which occurred while she was alive. Dr. Bulic provided extensive testimony that the victim suffered numerous blunt force injuries to her face, most likely caused by being punched. In addition, Dr. Bulic testified as to the seven defensive wounds and the fifteen additional stab wounds that Fitzgerald suffered, causing two collapsed lungs, an injury to her heart, and an injury to her liver. While some of the stab wounds were fatal, the injuries would not have caused death immediately but would have taken about five minutes before death occurred. Hall does not challenge any of this testimony.
Upon review of Dr. Bulic’s testimony, we find Hall is not entitled to relief. We conclude that no reversible error occurred in the admission of Dr. Bulic’s testimony and that the testimony pertaining to the sequence of the injuries in this case was not speculative.

Prior Crime Evidence Admitted During Penalty Phase

Hall contends that the trial court abused its discretion in allowing the testimonies of the victims from Hall’s prior felonies. We disagree. “[I]t is appropriate to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence rather than the bare admission of the conviction.” Franklin v. State, 965 So.2d 79, 96 (Fla.2007) (citing Tompkins v. State, 502 So.2d 415 (Fla.1986)). Evidence regarding, collateral crimes can be admissible; however, such evidence cannot be made a feature of the penalty phase proceeding. Rodriguez v. State, 753 So.2d 29, 44-45 (Fla.2000). “Admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion.” Ray v. State, 755 So.2d 604, 610 (Fla.2000).
The State offered evidence that Hall had committed prior violent felonies, introducing testimonies from two women whom Hall had raped. The defense objected to the testimonies of the two women as highly prejudicial and irrelevant. The trial court *274 overruled the objection and allowed the testimonies. Notably, defense counsel did not attempt to exclude parts of the testimonies which defense counsel considered more explicit or emotional than other parts, but did attempt to exclude the testimonies in their entirety, which we have clearly stated are admissible. See Franklin, 965 So.2d at 96. As a whole, the testimonies were not emphasized to a point where the prior offenses became a central feature of the penalty phase. See Rodriguez, 753 So.2d at 44-45. In keeping with this Court’s view that “it is generally beneficial to the defendant for the jury to hear about those details from a neutral law enforcement official rather than from prior witnesses or victims,” the victim’s testimony from Hall’s previous conviction for the first rape was read from the trial transcript by a third party. Id. Regarding Hall’s conviction for the second rape, the record reflects that the victim’s testimony simply related Hall’s crimes against her. The record indicates that the trial court allowed a leading question over defense objection “due to the witness’s emotional state.” However, besides this vague reference to the witness’s state, there is no other evidence that emotional displays or breakdowns occurred during the testimony. Accordingly, the trial court did not abuse its discretion by admitting the testimonies of Hall’s prior rape victims to prove the prior violent felony aggravator.
Hall also contends that the prior felony convictions were made into a feature of the penalty phase because of the State’s closing argument. We disagree. Because defense counsel did not object during the closing argument, this issue is not preserved for review absent fundamental error. See Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998) (“We have long held that allegedly improper prosecutorial comments are not cognizable on appeal absent a contemporaneous objection.”).
In the closing statement of the penalty phase, the State intertwined details from the prior felony conviction with facts of the present case to support a finding of the HAC aggravator for the present crime, urging the prior felonies as a basis for a recommendation of death:
Donna Fitzgerald, ladies and gentlemen, had the afore knowledge of her own death, the fear, the anxiety. The fear and anxiety and suffering that goes along with knowing you are about to die. Didn’t make a difference to Enoch Hall. He was completely indifferent to her suffering, exactly like he was indifferent to [G. S.], that 66-year-old lady, begging him, begging him for her heart pills. And how did he show his indifference? I don’t give a damn about your heart. Shut up, bitch. Heinous, atrocious, cruel.
Also, in countering mitigation offered by the defense that Hall had suffered from sexual abuse, the prosecutor referenced the prior crimes:
If you choose to believe that [Hall] was sexually battered in jail, I ask you, does that outweigh the fact that this defendant kidnapped, sexually battered and beat a 66-year-old lady? Kidnapped her in broad daylight. Does that outweigh the fact that this defendant kidnapped [D.D.] as she sat in her car at lunch in the parking lot outside her office, reading a book? Does it outweigh — his claim that he was sexually battered, does it outweigh the fact that he shoved a knife to [D.D.’s] neck as he pushed his penis inside her vagina? Does it outweigh the fact that he threatened to kill her every time she turned around and actually told her to drive down this dirt road because he was going to kill her? No.
*275 The prosecutor’s comments, which intertwined the facts of Hall’s previous crimes with the facts of the crime at issue, were blatantly improper. However, they were not so egregious as to reach the level of becoming a feature of the penalty phase so as to render the validity of the penalty phase questionable or produce fundamental error. See Brooks v. State, 762 So.2d 879, 898-99 (2000) (As a general rule, “failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error ... ”) (citations omitted). Thus, because the defense did not contemporaneously object to the prosecutor’s closing argument, the issue was not preserved for appeal, and because it does not constitute fundamental error, we deny relief.

Aggravating Circumstances

First, Hall contends that admitting evidence that he was serving two life sentences during the penalty phase amounted to inadmissible non-statutory aggravation. We disagree. The only aggravating circumstances that may be presented are limited to those set out in the death penalty statute. § 921.141(5), Fla. Stat. (2010). All relevant evidence, defined as that tending to prove or disprove a material fact, is admissible unless otherwise provided by law. See §§ 90.401-.402, Fla. Stat. (2010). However, relevant evidence is inadmissible where the probative value is substantially outweighed by the danger of unfair prejudice. See § 90.408, Fla. Stat. (2010). The admissibility of. evidence is within the sound discretion of the trial court, and the trial court’s determination will not be disturbed on appellate review absent a clear abuse of that discretion. See, e.g., Brooks v. State, 918 So.2d 181, 203 (Fla.2005) (citing Ray, 755 So.2d at 610), cert. denied, 547 U.S. 1151, 126 S.Ct. 2294, 164 L.Ed.2d 820 (2006).
Section 921.141(5) provides in relevant part:
Aggravating circumstances shall be limited to the following:
(a) The capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation.
§ 921.141(5), Fla. Stat. (2010). Hall cites no legal basis for his contention that the length of the sentence should not have been admitted when establishing the “under sentence of imprisonment” aggravator. On the contrary, caselaw supports admitting evidence of the length of the sentence during the penalty phase to establish the “under sentence of imprisonment” aggra-vator. See generally Parker v. State, 456 So.2d 436, 443 (Fla.1984) (in reference to remarks made by the prosecutor, this Court stated “The record shows that defendant was sentenced to life imprisonment for first-degree murder and later murdered two additional persons.... [I]t is manifestly obvious that ‘if life meant life’ the defendant would not have murdered these two additional victims.”); Kennedy v. State, 455 So.2d 351, 354 (Fla.1984) (The prosecutor’s statements during the penalty phase closing argument that the defendant’s prior life sentence had not deterred him from committing another murder were relevant to the aggravating circumstance that appellant was under sentence of imprisonment); Globe v. State, 877 So.2d 663, 675-76 (Fla.2004) (the trial court’s reference to the defendant’s three previous life sentences and statement that there would be no punishment if the death penalty was not imposed was an evaluation of the facts which supported the aggravating factor, not a consideration of non-statutory aggra- *276 vators). Here, the record shows that Hall was serving two life sentences at the time of the murder. The evidence that Hall was serving a life sentence is simply a fact of his case which supports the statutory aggravating factor of “under sentence of imprisonment.” It is not a non-statutory aggravator. Thus, the trial court did not abuse its discretion in allowing the State to reference the length of Hall’s previous life sentences. Accordingly, we reject Hall’s argument.
Next, Hall argues that the trial court erred in finding the HAC and CCP aggra-vators. As a result, Hall contends that this Court should strike those aggravators, find his death sentence disproportionate, and impose a life sentence. For the reasons expressed below, we uphold the HAC aggravator and strike the CCP aggravator, but find that the error is harmless beyond a reasonable doubt.
In reviewing the trial court’s finding of an aggravating circumstance, this Court’s “task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” McWatters v. State, 36 So.3d 613, 641 (Fla.2010) (quoting Lynch v. State, 841 So.2d 362, 368 (Fla.2003)), cert. denied, - U.S. -, 131 S.Ct. 510, 178 L.Ed.2d 378 (2010).

HAC

The HAC aggravator is proper “only in torturous murders — those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another.” Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998) (citing Kearse v. State, 662 So.2d 677 (Fla.1995)). We have repeatedly upheld the HAC aggravating circumstance in cases where the victim has been stabbed numerous times or been beaten to death and has remained conscious for at least part of the attack. See Guardado v. State, 965 So.2d 108, 116 (Fla.2007) (HAC proper where the defendant repeatedly stabbed the victim), cert. denied, 552 U.S. 1197, 128 S.Ct. 1250, 170 L.Ed.2d 90 (2008); Simmons v. State, 934 So.2d 1100, 1122 (Fla.2006) (HAC proper where victim suffered blunt trauma injuries and nonfatal stab wounds), cert. denied, 549 U.S. 1209, 127 S.Ct. 1334, 167 L.Ed.2d 80 (2007). Further, we have held that when a victim sustains defense-type wounds during the attack, it indicates that the victim did not die instantaneously and in such a circumstance HAC was proper. See Rolling v. State, 695 So.2d 278, 296 (Fla.1997); see also Reynolds v. State, 934 So.2d 1128, 1155 (Fla.2006) (HAC proper where victims exhibited defensive wounds, indicating that they were conscious during part of the attack and attempting to ward off their attacker).
In the instant case, Dr. Bulic described that Fitzgerald’s body bore evidence of blunt force injuries, mostly on both sides of the face, caused by punches from a hand. She was alive at the time of the blows. Fitzgerald’s hands and arms had sustained seven defensive wounds caused by a sharp instrument like a knife. She was alive at the time these wounds were inflicted. Fifteen additional stab wounds were inflicted upon her. One stab wound penetrated the abdominal wall and the liver causing internal bleeding. Ten stab wounds were inflicted upon Fitzgerald’s back. One of the back wounds entered the chest causing a rib to fracture and to penetrate the lung and liver. Three back wounds ended at the bottom of the left lung. Five additional back wounds entered the left lung. Fitzgerald sustained collapsed left and right lungs as a result of *277 the stab wounds and was alive at the time the stab wounds were inflicted. One left side back wound was “very deep” and penetrated the victim’s heart. The stab wound to the heart was “immediately lethal,” meaning that Fitzgerald would not have survived even if the wound had been immediately medically treated, and she would not have lived longer than 5 minutes after the infliction of that wound. The gold chain necklace Fitzgerald was wearing had been pulled tightly around her mouth and neck from behind in a manner so as to exert sufficient force to leave a postmortem mark consistent with ligation. The deep penetrating wounds to her back and side were closely grouped, consistent with being aimed at particular areas of the body. The method of killing in the instant case demonstrates that the HAC aggravator was properly found by the trial court. This manner of killing indicates that it was both conscienceless and pitiless of Fitzgerald’s life, and was unnecessarily torturous to Fitzgerald. Accordingly, there is competent, substantial evidence to support the trial court’s finding of the HAC aggravator.

CCP

Hall argues that the trial court’s finding of CCP was in error. In order to establish the CCP aggravator, the evidence must show that: (1) “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)”; (2) “that the defendant had a careful plan or pre-arranged design to commit murder before the fatal incident (calculated)”; (8) “that the defendant exhibited heightened premeditation (premeditated)”; and (4) “that the defendant had no pretense of moral or legal justification.” Franklin, 965 So.2d at 98 (citing Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). ‘“CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2001)). A court “must consider the totality of the circumstances when determining whether a murder was committed in a cold, calculated, and premeditated manner.” McGirth v. State, 48 So.3d 777, 793 (Fla.2010), cert. denied, - U.S. -, 131 S.Ct. 2100, 179 L.Ed.2d 898 (2011).
It is the State’s burden to prove beyond a reasonable doubt that the murder was the product of cool and calm reflection and not an act of emotional frenzy or panic or a fit of rage. See Walker v. State, 957 So.2d 560, 581 (Fla.2007). The circumstances show that Hall intended to search the paint room for pills and get high, but did not have a heightened plan to kill Fitzgerald. See Castro v. State, 644 So.2d 987, 991 (Fla.1994) (striking CCP where record showed that defendant planned to rob the victim but did not show the careful design or heightened premeditation to kill); Hansbrough v. State, 509 So.2d 1081, 1086 (Fla.1987) (holding that CCP did not apply to a robbery gone wrong and the defendant’s frenzied stabbing did not prove CCP). The trial court’s conclusion that Hall was waiting for Fitzgerald to come find him so he could attack her is speculative. See, e.g., Williams v. State, 37 So.3d 187, 196 (Fla.2010). “While circumstantial evidence can be used to support CCP, ‘the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor.’ ” Id. at 196-97 (citing Harris v. State, 843 So.2d 856, 866 (Fla.2003) (quoting Hildwin v. State, 727 So.2d 193, 194 (Fla.1998))). The evidence upon which the trial court relies in support of its finding that Hall was lying in wait to attack Fitzgerald could just as easily support Hall’s contention that he was hiding in the *278 paint room looking for pills. Furthermore, the trial court’s reliance on Hall’s actions after the murder of moving Fitzgerald’s body, changing his bloody clothes, cleaning up the blood, and running from the other officers as evidence that Hall preplanned Fitzgerald’s murder is also speculative. See, e.g., Williams, 37 So.3d at 196 (“[Although there was extensive evidence of actions that Williams took after the murder, there is no evidence that Williams procured any of the items he used to dispose of the body prior to the murder.”). Although there is extensive evidence regarding Hall’s actions after the murder, those actions do not prove that he planned Fitzgerald’s murder beforehand. Thus, the trial court’s finding that Hall’s murder was cold is not supported by competent, substantial evidence.
Regarding the second prong of CCP— that the defendant had a careful plan or pre-arranged design to commit murder before the fatal incident — this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of “calculated” is supported. See, e.g., Bell v. State, 699 So.2d 674, 677 (Fla.1997) (defendant announced he intended to kill the victim and purchased a gun for that purpose); see also Eaglin v. State, 19 So.3d 935, 948 (Fla.2009) (In plotting their escape, inmate co-defendants stated that “they would kill any bitch that got in their way.” Then, they procured a sledgehammer and killed two guards.). Here, Hall admitted that he armed himself with a shank while in the paint room to look for pills. Importantly, though, Hall never stated that he intended to kill Fitzgerald or anyone else, nor is there any other evidence that Hall armed himself for the purpose of attacking Fitzgerald rather than simply looking for pills. Aso, as Hall contends, the trial court erred in finding that Hall made the shank used to stab Fitzgerald. While there was testimony at trial that the shank in question, with its machined edge, was most likely made in the PRIDE facility, there was never evidence introduced that Hall was the one who fashioned the shank. The trial court relied on the unsubstantiated fact that Hall made the shank to conclude that the murder was part of a prearranged plan. Thus, there is not competent, substantial evidence to support the trial court’s finding of the “calculated” element.
Regarding the third prong — that the defendant exhibited heightened premeditation, this Court has upheld a finding of CCP where a defendant lay in wait for the victim’s arrival. See Dennis v. State, 817 So.2d 741, 765-66 (Fla.2002) (upholding CCP where defendant arrived at the apartment before the victim and waited for her arrival), cert. denied, 537 U.S. 1051, 123 S.Ct. 604, 154 L.Ed.2d 527 (2002). As discussed above, the evidence upon which the trial court relied in finding that Hall was awaiting Fitzgerald’s arrival could equally support Hall’s contention that he was simply looking for pills, in which case, Hall would not have had the heightened premeditation to kill Fitzgerald. Based on the aforementioned, the trial court’s finding of CCP is not supported by competent, substantial evidence. Accordingly, the CCP aggravator is stricken.

Harmless Error

When an aggravating factor is stricken on appeal, the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence. Williams v. State, 967 So.2d 735, 765 (Fla.2007). Despite striking CCP, four valid aggravating factors, including HAC and prior violent felony, two of the weightiest factors, remain. In addition to the weakness of the non-statutory mitigators, and the unanimous recommen *279 dation of death by the jury, any error in finding the CCP aggravator is harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

Emotional Disturbance Mitigation

Hall contends that the trial court erred in not finding the statutory mitigator of extreme mental or emotional disturbance. We disagree. The United States Supreme Court has held that a sentencing jury or judge may not preclude from consideration any evidence regarding a mitigating circumstance that is proffered by a defendant in order to receive a sentence of less than death. Hitchcock v. Dugger, 481 U.S. 393, 394, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). “Nevertheless, these cases do not preclude the sentencer from according the mitigating factor no weight.” Trease v. State, 768 So.2d 1050, 1055 (Fla.2000). A trial court may reject a mitigating circumstance provided that the record contains competent, substantial evidence to support the rejection. Reynolds, 934 So.2d at 1159. Further, a trial court has the discretion to reject a statutory mitigator where one expert’s testimony is rebutted by that of another. Zommer v. State, 31 So.3d 733, 749 (Fla.2010), cert. denied, - U.S. -, 131 S.Ct. 192, 178 L.Ed.2d 115 (2010). The weight given each mitigating factor is within the province of the sentencing court and will be sustained on appellate review absent abuse of discretion. Reynolds, 934 So.2d at 1159.
In the instant case, following a Spencer hearing, the trial court found that the defense did not establish the existence of this mitigating circumstance and placed no weight upon it. The trial court considered all the evidence that was presented by both sides during the Spencer hearing and determined that the State’s experts were more credible than the defense’s experts. Accordingly, the trial court adopted the State’s experts’ findings that Hall did not suffer from mental illness or emotional disturbance nor did the anti-seizure medication produce side effects that would cause the “unmasking” of such illness. Based on the foregoing, competent substantial evidence supports the trial court’s rejection of the extreme emotional or mental disturbance mitigator. Accordingly, we deny relief on this claim.

Proportionality

Hall contends that his death sentence is not proportionate. “[T]o ensure uniformity in death penalty proceedings, ‘we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’” Floyd v. State, 913 So.2d 564, 578 (Fla.2005) (quoting Anderson v. State, 841 So.2d 390, 407-408 (Fla.2003)). This Court has described its “proportionality review” as involving “a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.” Tillman v. State, 591 So.2d 167, 169 (Fla.1991) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (emphasis omitted)).
In the instant case, Hall was convicted of the stabbing murder of Fitzgerald. The trial court found five aggravators: (1) previously convicted of a felony and under sentence of imprisonment — great weight; (2) previously convicted of another capital felony or of a felony involving the use or threat of violence to the person — great weight; (3) committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws — great weight; (4) especially heinous, atrocious or cruel — -very great weight; (5) cold, calcu *280 lated, and premeditated — very great weight; (6) the victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties — no weight — merged with aggravated number 3 as listed above. In mitigation, the sentencing court found no statutory mitigators and gave “little weight” and “some weight” to eight non-statutory mitigating circumstances: (1) Hall was a good son and brother — some weight; (2) Hall’s family loves him — little weight; (3) Hall was a good athlete who won awards and medals — little weight; (4) Hall was a victim of sexual abuse — some weight; (5) Hall was productively employed while in prison — some weight; (6) Hall cooperated with law enforcement — some weight; (7) Hall showed remorse — little weight; and (8) Hall displayed appropriate courtroom behavior — little weight.
Although we have stricken the CCP aggravated, the death sentence is proportional. See Duest v. State, 855 So.2d 33, 47-48 (Fla.2003) (death sentence proportionate where defendant stabbed victim numerous times and the trial court found aggravators of prior violent felony, felony murder merged with pecuniary gain, and HAC and twelve nonstatutory mitigators); Jimenez v. State, 703 So.2d 437, 440-42 (Fla.1997), receded from on other grounds by Delgado v. State, 776 So.2d 233 (Fla.2000) (death penalty proportionate where defendant stabbed woman to death and the court found four aggravating circumstances: (1) capital felony committed by a person previously convicted of a felony and placed on community control; (2) defendant previously convicted of another capital felony or felony involving the use or threat of violence; (3) capital felony committed while defendant was engaged in the commission of, or an attempt, or flight after committing or attempting to commit the crime of burglary of an occupied dwelling; and (4) HAC, and the trial court found one statutory mitigating circumstance (lack of capacity to appreciate the criminality of conduct), and two non-statutory mitigating circumstances); Johnson v. State, 660 So.2d 637, 641, 648 (Fla.1995) (death penalty proportionate where defendant fatally stabbed woman, and the trial court found three aggravating circumstances: (1) prior violent felony; (2) commission of a murder for financial gain; and (3) HAC, and fifteen mitigating circumstances). Moreover, as we have previously recognized, “[qualitatively, prior violent felony and HAC are among the weightiest aggrava-tors set out in the statutory sentencing scheme.” Hodges v. State, 55 So.3d 515, 542 (Fla.2010) (citing Zommer, 31 So.3d at 751), cert. denied, - U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011). In light of these cases which involve similar factual circumstances and similar aggravating factors, Hall’s death sentence is proportionate.

Ring Claim

Hall contends that Florida’s death statute violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Ring, the United States Supreme Court held that where an aggravating circumstance operates as the functional equivalent of an element of a greater offense in capital sentencing, the Sixth Amendment to the United States Constitution requires that the aggravating circumstance must be found by a jury. Id. at 602, 122 S.Ct. 2428. This Court has held that Ring does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable. Victorino v. State, 23 So.3d 87, 107-08 (Fla.2009). Hall qualified for both the pri- or violent felony and the under-sentence-of-imprisonment aggravators. We find Hall’s claim without merit.

*281
Sufficiency of the Evidence

We have a mandatory obligation to independently review whether there is sufficient evidence to support a first-degree murder conviction. Miller v. State, 42 So.3d 204, 227 (Fla.2010) (citing Blake v. State, 972 So.2d 839, 850 (Fla.2007)), cert. denied, - U.S. -, 131 S.Ct. 935, 178 L.Ed.2d 776 (2010); Fla. R.App. P. 9.142(a)(6). In conducting this review, we “view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Rodgers v. State, 948 So.2d 655, 674 (Fla.2006) (citing Bradley v. State, 787 So.2d 732, 738-39 (Fla.2001)). “Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. The purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of the act.” Bradley, 787 So.2d at 738 (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)). Premeditation may be inferred from such facts as “the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Id. (quoting Norton v. State, 709 So.2d 87, 92 (Fla.1997)).
Here, sufficient evidence exists to support a conviction for first-degree murder. Hall admitted right after the killing of Fitzgerald that “I freaked out. I snapped. I killed her.” Hall admitted to Agent Miller that he stabbed Fitzgerald with the shank after she found him and told him to leave the building. The medical examiner testified that Fitzgerald had twenty-two stab wounds inflicted on her body, including defensive wounds on the arms and hands, wounds to her abdomen, and wounds to both sides of her back, some of which pierced both her lungs and her heart. Dr. Bulic also testified that the fatal wounds were grouped together in a way that was consistent with Hall aiming at certain organs. Fitzgerald’s face showed blunt force injuries consistent with being punched by a fist. Based on this evidence, the jury could have found that Hall had a fully-formed conscious purpose to kill at the time of the homicide. Accordingly, there was sufficient evidence that Hall committed the homicide with “a premeditated design to effect the death of the person killed[.]” See § 782.04(l)(a)l, Fla. Stat. (2010).
CONCLUSION
Based on the foregoing, we affirm Hall’s conviction and sentence.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.
QUINCE, J., concurs in part and dissents in part.

. The PRIDE compound consists of numerous outbuildings and one main bay area.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. Tomoka inside security officer Chad Weber, Tomoka sergeant Bruce MacNeil, Tomo-ka captain Shannon Wiggins, Tomoka correctional officer Brian Dickerson, Volusia County Branch Jail registered nurse John Gordon, Florida State Prison practical nurse Michael Fowler, Volusia County Branch Jail corrections officer Gary Schweit, Tomoka corrections officer Hector Olavarria, Tomoka sergeant Denver Kelso, Inspector General's Office institutional inspector for Tomoka John Joiner, Inspector General’s Office senior inspector Barry Glover, and FDLE agent Stephen Miller.