# Supreme Court of Florida

_____

No. SC15-1662
_____

**ENOCH D. HALL,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-224
_____

**ENOCH D. HALL,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[February 9, 2017]

PER CURIAM.

Enoch Hall appeals an order of the postconviction circuit court denying his

initial motion to vacate his conviction of first-degree murder and sentence of death

filed pursuant to Florida Rule of Criminal Procedure 3.851. He also petitions this

Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the postconviction court's denial of relief on all claims and deny Hall's petition for a writ of habeas corpus.

**Trial and Appeal**

Enoch Hall was convicted and sentenced to death for the first-degree premeditated murder of Corrections Officer (CO) Donna Fitzgerald. Hall v. State, 107 So. 3d 262, 267 (Fla. 2012). In affirming Hall's convictions, this Court previously detailed the facts surrounding the murder:

> On July 10, 2008, Enoch Hall was indicted by the grand jury for the murder of Florida Department of Corrections Officer Donna Fitzgerald. Hall was an inmate at [Tomoka Correctional Institution (TCI)], who worked as a welder in the Prison Rehabilitative Industries and Diversified Enterprises, Inc. (PRIDE) compound where inmates work refurbishing vehicles. Sergeant Suzanne Webster was working as the TCI control room supervisor, where she was responsible for getting a count from all areas of the prison as to the number of inmates in each area. When Webster had not heard from Fitzgerald, who was working in the PRIDE compound that night, Webster radioed Officer Chad Weber, who went to the PRIDE facility with Sergeant Bruce MacNeil to search for Fitzgerald. Weber saw Hall run through an open door on the other end of one of the PRIDE buildings and Weber and MacNeil pursued Hall. Weber caught up to Hall, who repeatedly stated "I freaked out. I snapped. I killed her." Hall responded to Weber's commands and placed his hands on the wall and was handcuffed. Weber took possession of the PRIDE keys that Hall had in his hands. Officer Chad Birch shouted from inside the building, "Officer down!" and Hall remained outside with other officers while Captain Shannon Wiggins and Officers Weber and MacNeil entered the building and located Fitzgerald's body. Fitzgerald's body was found lying face down on top of a cart in the paint room. The upper part of her body was wrapped in gray wool blankets, and the bottom half of her body came over the back of the

- 2 -

cart, with her pants and underwear pulled down to her knees. Inside a bucket of water that was on the floor next to Fitzgerald's legs was Hall's bloody T-shirt. Hall was escorted to the medical facility (MTC) of the prison by Officers Brian Dickerson and Gary Schweit. Several officers took turns watching Hall while he sat in the MTC. Hall was later escorted to a conference room to talk with investigators from the Florida Department of Law Enforcement (FDLE) and then to a cell. Hall gave three statements to FDLE agents throughout the night regarding the events of the murder.

## Guilt Phase

A jury trial commenced on October 12, 2009. Daniel Radcliffe, a crime scene investigator for FDLE, testified that he found two packets of pills in a file cabinet in the paint room of PRIDE where the body was discovered. The pill packets had an inmate's name on them, Franklin Prince, and were labeled Ibuprofen 800 milligrams and Carbamazepine, a generic equivalent of Tegretol, 200 milligrams, an anti-seizure medication. Hall's white T-shirt was found in a bucket of water with other shirts in the paint room, and Hall's pants were found in a pile of clothes, also in the paint room. Months later, Hall's blue prison shirt was found lodged on top of a paint booth. Granules of Speedy Dry, an oil absorbent material, were found on the ground in front of the welding shed and in a coffee can next to the shed. The granules tested positive for blood and DNA testing confirmed that it was Fitzgerald's. A broom found nearby had Fitzgerald's blood on the broom head. Blood was found on the walls of the welding shed. Also found in the welding shed was a cap, which had Fitzgerald's blood on it. Hall's clothes, including his underwear, tested positive for Fitzgerald's blood. A sexual assault analysis was performed on Fitzgerald's body. Jillian White, a crime lab analyst with the FDLE, testified that there was no evidence of semen on the body. Wiggins testified that he was a commander of the TCI rapid response team and as part of his job would search prisons for weapons. Wiggins testified that shanks made in the PRIDE facility differed from the usual ones made by inmates in that they had a machined edge made by a grinder. Wiggins testified that the shank recovered from the wall of the paint room which appeared to be the murder weapon had a meticulously sharpened point like those made from a tool grinder in the PRIDE facility.

The State played the three confessions Hall made on the night of the murder. In the first statement, given to FDLE agents and TCI personnel, Hall admitted to killing Fitzgerald and stated that he had taken four pills that Frank Prince, another inmate working in PRIDE, had given to him. Later that day, when his shift ended, Hall went looking for more pills, but was unable to find any and became angry. Officer Fitzgerald came in and laughed and called Hall by his nickname, "Possum, come on, get out of there." Hall told her to get out. Fitzgerald grabbed Hall's arm and he "freaked out" and began to stab her with a sharp piece of metal that he found on the floor of the room. Hall then took off his bloody shirt, put it in a bucket of water, and put on one of Prince's shirts. He picked up the PRIDE keys and continued to look for pills. Hall stated that he did not remember pulling Fitzgerald's pants down. Hall said that he did not want to have sex with Fitzgerald. Hall repeatedly stated that he just wanted to get high.

The second statement, given at about 1:30 a.m., was taken by Agent Stephen Miller of the FDLE upon Hall's request in the cell in which Hall had been placed. During this interview, Hall admitted that he killed Fitzgerald somewhere other than the room where she was found. Fitzgerald found Hall searching for pills in the office. He ran out past her, she chased him to the welding shed, and he stabbed her there. Hall carried her to the office and placed her on the cart. Hall said he threw some dirt on the blood outside the welding shed. Hall told Miller that he hid the knife in a cinderblock wall near the welding shed. Hall also told Miller he did not think he was "going to make it to tomorrow." Miller told Hall that he would transport him to the branch jail in a little while.

The third statement was given at about 3:30 a.m. and was made only to the FDLE agents. In this third statement, Hall agreed that in his first statement he said he killed Fitzgerald inside the PRIDE building, but in his second statement he admitted to killing her in the welding area outside the PRIDE building. Hall admitted that he stayed behind in the PRIDE compound to look for drugs. While looking for drugs, Hall found the shank by the sink in Prince's office and took it with him. When he realized Fitzgerald was looking for him, Hall hid inside the welding shed. Fitzgerald opened the shed door and came in and tried to grab him. He tried to run past her, but she would not let go, so he stabbed her. Hall did not recall how many times he stabbed her, but said he stabbed her enough times "just to get

by." Fitzgerald fell to the ground inside the shed; he did not know whether or not she was alive. He hid the shank in the wall and spread some Speedy Dry on the ground in the welding area to soak up the blood. Hall wrapped her up in a towel and blankets and carried her back to the paint room/office. Hall placed her on a cart. He then continued to look for pills, but was not able to find any. Hall went back to the room where Fitzgerald was and pulled down her pants. He did not sexually assault her. Hall said he put his shirt in a bucket of water, put on Prince's shirt, but kept on his own pants. Corrections officers entered the PRIDE facility and he attempted to run from them.

Dr. Predrag Bulic, the Volusia County associate medical examiner, testified for the State about the injuries Fitzgerald sustained based on her autopsy results. He testified that Fitzgerald's body bore evidence of blunt force injuries, mostly on her face, consistent with those caused by punches from a hand. Fitzgerald's hands and arms had sustained defensive wounds caused by a sharp instrument consistent with a knife. Fifteen additional stab wounds were inflicted upon Fitzgerald, including on her stomach, back, and chest. Dr. Bulic also testified that a gold chain necklace on Fitzgerald's body had been pulled tightly around her mouth and neck from behind in a manner so as to exert sufficient force to leave a postmortem mark consistent with ligation. On October 23, 2009, Hall was convicted of first-degree murder.

Penalty Phase

The penalty phase commenced on October 27, 2009. The defense renewed its previously argued motion to preclude the State from offering evidence of the length of Hall's sentences he was serving when he killed Fitzgerald. The trial court denied the motion and the State offered evidence that Hall was serving two consecutive life sentences when he murdered Fitzgerald.

The State also offered evidence that Hall had committed prior violent felonies, introducing testimony from two women whom Hall had raped. The defense objected to the testimony of the two women as highly prejudicial and irrelevant. The trial court overruled the objection and allowed the testimonies.

Victim impact statements were published for the jury. Donald and Dana Shure, Officer Fitzgerald's younger brother and sister,

prepared written statements and read them to the jury. Joanne Dunn, Fitzgerald's mother, also read a statement to the jury.

The defense presented several witnesses during the penalty phase to support mitigation. James Hall, Hall's father, testified that Hall was a good son and got along well with his two younger brothers. He also testified that Hall had been raped in jail at age 19, when his girlfriend's mother's boyfriend, a law enforcement officer, arranged to have him put in jail after a dispute. After his release, Hall became afraid and mostly stayed home, and he eventually started living in a shelter in the woods. James Hall had not seen his son since 1995. Hall's mother, Betty Hall, also testified regarding her son's love for sports growing up. Dr. Reid Hines, a dentist, testified telephonically that he and Hall had played sports together in high school and that Hall was an excellent athlete. Bruce Hall, the former plant manager for PRIDE, testified that Hall started at PRIDE as an apprentice welder and eventually worked his way up to lead welder. Rodney Callahan, an inmate who used to work with Hall, described him as a very good worker, conscientious, and responsible.

Dr. Daniel Buffington, a pharmacologist, testified for the defense that, among other possible side effects, both Ibuprofen and Tegretol have the capacity to alter someone's behavior. The State called Dr. Wade Myers on rebuttal, who testified that most people who take an overdose of Ibuprofen do not have any side effects and the remaining people typically complain of nausea, and that Tegretol has an anti-aggression component to it, and, in his opinion, it "would be very unlikely" to cause aggression—"You're going to get the opposite effect."

The jury returned a recommendation of death by a unanimous vote.

Spencer [n.2] Hearing

[n.2] Spencer v. State, 615 So. 2d 688 (Fla. 1993).

In support of the defense's contention that Hall should receive the emotionally and mentally disturbed statutory mitigator, Dr. Harry Krop testified for the defense that Hall had a cognitive disorder, not otherwise specified, coercive paraphilia disorder-multiple sexual offender, and an alcohol substance abuse disorder. Krop testified that Hall had a serious emotional disorder at the time of the offense and

- 6 -

that Hall's ingestion of Tegretol could bring out his underlying psychological traits.

The State offered rebuttal testimony from Dr. William Riebsame, a forensic psychologist and professor of psychology, and Dr. Jeffery Danziger, a board certified forensic psychiatrist. Riebsame testified that the results of the tests administered to Hall by Krop were questionable, because Krop failed to test for malingering. Danziger testified that he administered two tests to determine whether Hall was mentally ill or was malingering. A score of more than 14 is highly correlated with malingering and Hall's score was 29. Danziger arrived at the opinion that Hall has a history of substance abuse, adult anti-social behavior, history of sexually-related charges, possible psychosexual disorder, and pseudo-seizure disorder by history. Danziger strongly disagreed with any attempt by Buffington to diagnose a psychological condition and disagreed with Buffington's opinion that Tegretol could unmask an underlying psychological illness. The trial court found that Hall did not establish the existence of mental or emotional disturbance as a statutory mitigating circumstance and gave it no weight.

In the trial court's Sentencing Order, the court found five aggravators: (1) previously convicted of a felony and under sentence of imprisonment—great weight; (2) previously convicted of another capital felony or of a felony involving the use or threat of violence to the person—great weight; (3) committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws—great weight; (4) especially heinous, atrocious or cruel—very great weight; (5) cold, calculated, and premeditated—very great weight; (6) the victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties—no weight—merged with aggravator number 3 as listed above. In mitigation, the sentencing court found no statutory mitigators and eight non-statutory mitigating circumstances: (1) Hall was a good son and brother—some weight; (2) Hall's family loves him—little weight; (3) Hall was a good athlete who won awards and medals—little weight; (4) Hall was a victim of sexual abuse—some weight; (5) Hall was productively employed while in prison—some weight; (6) Hall cooperated with law enforcement—some weight; (7) Hall showed remorse—little weight; and (8) Hall displayed appropriate courtroom behavior—little weight. The trial court concluded that the aggravating circumstances far outweighed the mitigation and gave

great weight to the jury's unanimous recommendation of death. Thus, the trial court imposed the sentence of death.

Id. at 267-71 (footnote omitted).

On direct appeal, this Court held that the trial court's finding of the cold, calculated, and premeditated aggravator was not supported by competent, substantial evidence and thus it was stricken. Id. at 278-79. Nevertheless, the Court ultimately affirmed Hall's conviction and sentence. Id. at 281. The United States Supreme Court denied certiorari review on October 7, 2013. Hall v. Florida, 134 S. Ct. 203 (2013).

**Postconviction Proceedings**

Pursuant to Florida Rule of Criminal Procedure 3.851, on September 17, 2014, Hall filed a motion to vacate his judgment of conviction and sentence. Hall claimed that his counsel were ineffective during both the guilt and penalty phases of his trial and that he was deprived of a fair trial by the individual and cumulative effect of any errors. Hall also claimed that his execution will violate his constitutional rights because he may be incompetent at the time of execution. Furthermore, in his petition for writ of habeas corpus to this Court, Hall presents two claims: (1) the jury instructions in capital sentencing are unconstitutional; and (2) trial counsel was ineffective in litigating the facial and as-applied constitutional challenges to Florida's capital sentencing statute.

Hall presented ten witnesses during the evidentiary hearing: (1) Lt. Stephan Farrow, the officer who recorded Hall's transport video from the Volusia County Jail to Florida State Prison; (2) John Joiner, the officer who conducted the investigation with regard to PRIDE prison procedures for the Inspector General's Office; (3) Elizabeth Lasseter, Hall's half-sister; (4) Rodney Callahan, a fellow inmate and PRIDE employee; (5) Jesse Eugene Hall, Hall's uncle; (6) Enoch James Hall, Hall's father; (7) Walter Schell, a fellow inmate and PRIDE employee; (8) Dr. Michael Maher, M.D., a psychiatrist; (9) James Valerino, one of Hall's two trial attorneys; and (10) Matthew Phillips, Hall's second trial attorney. The State presented three witnesses: (1) Agent Steven Miller, a Special Agent with FDLE who investigated the crime and interviewed Hall after the murder; (2) Investigator Robert Ryan, an investigator for the Office of the Public Defender who conducted Hall's mitigation investigation; and (3) Dr. Jeffrey Danziger, M.D., a psychiatrist for the State.

Hall's motion for postconviction relief was denied on July 8, 2015, and his motion for rehearing was denied on August 7, 2015. This appeal follows.

## ANALYSIS

### Strickland Standard of Review

Under Strickland v. Washington, 466 U.S. 668, 687 (1984), a defendant seeking relief on the basis of ineffective assistance of counsel must establish both

that counsel's performance was deficient and that this deficient performance prejudiced the defendant, thus depriving him of a reliable proceeding.

Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the court's factual findings that are supported by competent, substantial evidence, but reviewing the court's legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004). Moreover, because Strickland requires that a defendant establish both deficiency and prejudice, an appellate court evaluating a claim of ineffectiveness is not required to issue a specific ruling on one component of the test when it is evident that the other component is not satisfied. See Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006).

There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. This Court has held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).

**Juror Challenge**

Hall first asserts that trial counsel was ineffective for using a peremptory strike on prospective juror Rapone, instead of striking her for cause, and that this peremptory strike should have been used to challenge prospective juror Roddy instead. Hall argues that Roddy was biased because he supervised a full time TCI corrections officer at his work and he had discussed Hall's case with this officer. We disagree.

Deficiency

First, Hall has failed to establish deficient performance. There is competent, substantial evidence to support the postconviction court's conclusion that trial counsel's failure to challenge juror Rapone for cause and the subsequent use of a peremptory challenge, rather than a for-cause challenge, was likely the result of reasonable trial strategy and, therefore, did not rise to deficient performance. See Evans v. State, 995 So. 2d 933, 942 (Fla. 2008) ("Although [the juror] clearly supported the death penalty and initially indicated that a case of self-defense would be the only time she would recommend life, she immediately confirmed that she would listen to the judge's instructions, 'consider all circumstances' and follow the law. Based on her clear confirmation of her ability to follow the law and counsel's belief that she would be a good guilt-phase juror, counsel's decision not to challenge [the juror] was reasonable and a matter of trial strategy.") (citing Dufour

v. State, 905 So. 2d 42, 54-55 (Fla. 2005)).  Specifically, although juror Rapone

initially stated that she had a preexisting opinion as to Hall's guilt, she retreated

from that view during extensive questioning by attorney Valerino.[1]

---

1. Juror Rapone's testimony regarding both her opinion of guilt and her subsequent rehabilitation read as follows:

MR. VALERINO: Had you formed any opinion about the case [given your media exposure]? . . .

PROSPECTIVE JUROR RAPONE: Well, you know, when you see rape and you see a prisoner's involved, you know, you seem to think, well, he's already in jail, he's already in prison, he's supposed to be learning a lesson, and what's going on.  And yes, I formed an opinion.  It was not a good opinion.

MR. VALERINO: Okay.  And so have you formed an opinion as to whether he's guilty or not guilty, based on the information you've received?

PROSPECTIVE JUROR RAPONE: Well, now that I'm in this situation, I've learned some things, and I know my duty, you know, my—probably, I know my opinion should not matter until I've learned all the facts.  However, I have formed an opinion.  So, yes.

MR. VALERINO: What is that opinion?

PROSPECTIVE JUROR RAPONE: That he's guilty. . . .

MR. VALERINO:  Having an opinion that he's guilty, do you have an opinion, having read in the newspaper that he was serving a life sentence, and having read in the newspaper it was for rape, as to what sentence he should receive, death or life in prison without parole?

PROSPECTIVE JUROR RAPONE: I did not have an opinion until I was asked, probably today, about the death penalty, and I really don't have an opinion now.  I know it's on my mind.  It's something I may

Furthermore, this strategic decision was reinforced by Valerino's testimony that juror Rapone had been sufficiently rehabilitated, thus explaining counsel's use of a peremptory challenge. Specifically, attorney Valerino explained:

> Okay. In regards to Juror Rappone [sic], she is the one who I had the words—and I don't know if Mr. Phillips did, too, but I had the words cause next to her name in different areas.
> In reviewing the voir dire of Ms. Rappone [sic], in Volume XV, starting at page 503, the Court asked Ms. Rappone whether or not what she had heard and her opinions—what she had heard about the

---

> have to consider in the next few days, if I am chosen. But I did not have an opinion at that time, no.
>
> MR. VALERINO: So are you able to set aside the information you've received that you've told us about in making a decision on guilt or innocence, and, also, if we get to the second phase, the possible penalty?
>
> PROSPECTIVE JUROR RAPONE: As I said before, I believe I can. Yes. . . .
>
> THE COURT: Ms. Rapone, is the opinion that you have that you expressed to Mr. Valerino, so I'm certain, is the opinion that you expressed as to his being guilty, is that so fixed in your mind that you believe you would be unable to set it aside and keep an open mind for the purpose of this case, listen to the evidence and the law the Court gives to you, to discuss the case with your fellow jurors in deliberation, after hearing argument of counsel, and returning a fair verdict, could you still do that?
>
> PROSPECTIVE JUROR RAPONE: Yes.
>
> THE COURT: You could do that?
>
> PROSPECTIVE JUROR RAPONE: Yes.

case could be set aside and if she could hear the—decide the case based on what she just heard in the courtroom and the arguments of the attorney and return a fair verdict.

　　And she indicated that she could do that. And so based on that answer, I'm kind of assuming, based on that answer, we felt that she had been rehabilitated for a cause challenge.

Thus, we hold that Hall has failed to show deficient performance for this claim.

Prejudice

Furthermore, Hall has not established prejudice. In the postconviction context, we have held that a defendant must establish that an <u>actually biased</u> juror sat on the jury to succeed on a claim of ineffective assistance of counsel for failing to make a cause challenge. <u>See</u> <u>Carratelli v. State</u>, 961 So. 2d 312, 324 (Fla. 2007). This is a higher standard than on direct appeal—mere doubt about a juror's impartiality is insufficient under this standard. <u>See</u> <u>id.</u>; <u>see also</u> <u>Johnston v. State</u>, 63 So. 3d 730, 744-45 (Fla. 2011).

Hall has failed to show that the juror in question was actually biased. Competent, substantial evidence supports the postconviction court's determination that juror Roddy's work relationship with a TCI officer did not establish actual bias. Notably, the postconviction court judge was the same judge that presided over the jury selection process and was therefore in a better position to observe juror Roddy's demeanor and the genuineness of his answers relating to his ability to be fair and impartial. <u>See</u> <u>Carratelli</u>, 961 So. 2d at 319 ("[T]he trial court 'has a

- 14 -

unique vantage point in the determination of juror bias' that is unavailable to us in the record.").

Upon being questioned by trial counsel, juror Roddy assured the court that he was willing to "weigh all the facts, both pro and con, for and against, and render a decision based on that." Further, Roddy also assured counsel that his work relationship with a TCI corrections officer would not pressure or affect his decision-making process as a juror. Similar to the facts in Carratelli, where the Court found the record supported the challenged juror's lack of bias because he "held no firm opinion except that he could be fair, listen to the evidence, and follow the law," 961 So. 2d at 327, here, juror Roddy similarly assured the court that he had no set opinion and would abide by the law and consider the evidence presented in making his determination. Therefore, we conclude that Hall has failed to establish juror Roddy's actual bias as required under Carratelli.

In addition, even if counsel was deficient for failing to ask the court for an additional peremptory challenge in order to strike juror Roddy, this deficiency is unlikely to have prejudiced Hall, given the fact that the trial court had already granted the defense three additional peremptory challenges and was unlikely to grant another for juror Roddy. Thus, juror Roddy would likely have still served on Hall's jury, even if counsel had requested an additional peremptory challenge, and

the result of Hall's case thus would have remained the same. Therefore, we conclude that this claim fails.

## Ineffectiveness at the Guilt Phase

Hall next argues that his trial counsel was ineffective at the guilt phase for failing to adequately investigate, develop a defense, and challenge the State's case. We disagree.

Primarily, Hall has failed to establish prejudice. Competent, substantial evidence supports the postconviction court's findings that trial counsel were not ineffective at the guilt phase. Notably, for all of the sub-claims addressed below, none of the alleged deficiencies would have rebutted Hall's own confession that he hid from CO Fitzgerald in the welding shed with a shank after she confronted him in Prince's office while he was looking for pills. This confession established the requisite premeditation in the State's case, and none of the alleged deficiencies would have rebutted this evidence. Therefore, we conclude that Hall has failed to establish prejudice with regard to this claim.

### Stress at PRIDE

In his first sub-claim, Hall claims that trial counsel was deficient for failing to introduce evidence of the stressful work conditions at PRIDE in an attempt to explain what caused Hall to "freak out" on the night of the murder. We hold that Hall has failed to establish deficiency under this sub-claim.

We have repeatedly stated that, under Strickland, reasonable strategic decisions do not constitute ineffective assistance of trial counsel. See Bradley v. State, 33 So. 3d 664, 671-72 (Fla. 2010). We have also stated that mere disagreement by a subsequent counsel with a strategic decision of a predecessor does not result in a showing of deficient performance. See Occhicone, 768 So. 2d at 1048. Differing, yet reasonable trial strategy comes in various forms. One example is trial counsel's decision to not call certain witnesses to testify. See Johnston, 63 So. 3d at 741.

The postconviction evidence indicated, and the postconviction court found, that counsel chose not to present evidence of stress to the jury during the guilt phase because it was inconsistent with counsel's theory of defense. Attorney Valerino testified during the evidentiary hearing that the theory of Hall's defense was that he had taken pills earlier in the day and needed more, and he stayed late to look for more pills.

Attorney Valerino further testified that presenting testimony from other inmates about the stressful work conditions at PRIDE would not have helped Hall's case or been consistent with Hall's theory of defense. Rather, attempting to present testimony about stress would have potentially hurt Hall's case due to the lack of corroborating evidence to show that Hall was particularly stressed on the day of the murder. Specifically, attorney Valerino testified:

- 17 -

I just don't think that the issue of stress was an issue that was going to help our case in light of the testimony of the other inmates that, although they felt stress, they never got punished, never had repercussions from the events.

Another reason not to call inmates, and this was the reason why we selected the ones we did, is most of the other inmates had contact with Mr. Hall during that day, and nobody saw anything unusual.

He wasn't acting unusual that day. As a matter of fact, the—his assistant, Mr. Geddis, he was a welding assistant.

We took his deposition, and he indicated that Mr. Hall did his job normal that day. There was nothing unusual about him. He wasn't acting weird, nothing out of the ordinary.

So we were also reluctant to call witnesses who might have testified, because we had this defense of the pills, that Mr. Hall was testifying—or was acting normally, that he was acting like he did every day and he wasn't acting unusual.

We find that competent, substantial evidence supports the postconviction court's finding that attorneys Valerino and Phillips made a strategic decision not to present evidence of the alleged stressful work conditions at PRIDE in light of the lack of corroborating evidence from co-workers. Had they chosen to present this evidence, the State almost certainly would have rebutted the evidence by bringing to light the fact that all of the inmates at PRIDE may have experienced stress, yet none of them murdered CO Fitzgerald. Furthermore, evidence about stressful work conditions would likely have also led to rebuttal testimony about Hall's seemingly normal behavior on the days leading up to the murder and on the day of the murder, which would directly contradict the defense's theory that Hall was high on the pills that caused him to "freak out." Therefore, we find that this sub-claim fails.

PRIDE Overtime Closing Procedures

Hall next argues that trial counsel were deficient for failing to present evidence of PRIDE's closing procedures for the overtime shift and officers' use of chemical agents and body alarms when supervising the PRIDE facility as a way to rebut the State's contention that he was lying in wait for CO Fitzgerald and place fault on the victim for the murder. We find that Hall has failed to establish deficiency under this sub-claim.

Competent, substantial evidence supports the postconviction court's finding that Valerino and Phillips considered the relevance of this evidence and ultimately decided against presenting it due to the potential that the jury would see this evidence as an attempt to blame the victim. In fact, attorney Valerino justified his reasoning as follows:

> We did not present any testimony regarding her failure to apply—or follow the rules because I viewed that as that would almost be an argument that the jury would think that she deserved what she got by not complying with the rules of the Department of Corrections.
> In addition, it's somewhat—just by Mr. Hall's own statement, he knew Ms. Fitzgerald was back there because he first saw her in Franklin Prince's room when he ran out of there and then went and hid in the welding—I think they called it the welding shed when she came in, so.

Moreover, attorneys Valerino and Phillips testified that they considered presenting evidence about PRIDE closing procedures and CO Fitzgerald's unusual actions of dismissing all of the other PRIDE inmates before going to find Hall by

herself, without carrying any chemical agents or body alarms, and they weighed the pros and cons of doing so. Ultimately, they decided not to present this evidence to avoid the potential negative impact it could have on the jury. Trial counsel's decision not to present evidence that could potentially be seen as advocating that CO Fitzgerald "deserved what she got" is certainly a reasonable strategic decision under the norms of professional conduct. Therefore, we conclude that Hall has failed to establish trial counsel's deficiency.

Unsupervised Access to Sheet Metal and Grinders

Hall's next sub-claim contends that trial counsel was deficient for failing to introduce additional testimony to show that all inmates working at PRIDE had unsupervised access to sheet metal and grinders, rather than the evidence presented that the welders had unsupervised access to sheet metal and grinders.

We find that Hall has failed to establish trial counsel's deficiency for failing to present evidence of PRIDE inmates' unsupervised access to sheet metal. Testimony was presented at trial that other PRIDE welders had access to sheet metal and grinders, and that these other inmates could have made the shank that Hall ultimately used to kill CO Fitzgerald. Moreover, attorney Valerino testified at the evidentiary hearing that he did not present additional evidence about the issue of who made the shank because he was relying on Hall's statement that he found the shank. Thus, presenting more evidence about who had unsupervised access to

sheet metal and grinders would have been merely cumulative to Hall's own confession that he found the shank in Prince's office while looking for pills and to Captain Wiggins' testimony about PRIDE welders' access to sheet metal and grinders. The failure to present cumulative evidence does not constitute deficient performance. See Beasley v. State, 18 So. 3d 473, 484 (Fla. 2009). We therefore hold that counsel were not deficient because they made a reasonable decision not to present additional evidence about the unsupervised access to sheet metal and grinders at PRIDE. This sub-claim thus fails.

Toxicology Screen

Hall's next sub-claim asserts that trial counsel were deficient for failing to request a toxicology screen to corroborate Hall's own statement that he was under the influence of Tegretol pills at the time of the murder.

We conclude that Hall has failed to establish trial counsel's deficiency for this sub-claim. Competent, substantial evidence supports the postconviction court's finding that trial counsel were not deficient for failing to request a toxicology screen to test for drugs in Hall's system. Attorney Phillips testified at the evidentiary hearing that, to request a toxicology screen from an independent

lab, the request must specifically allege what substances the lab must test for.[2]

Attorney Valerino testified that his first encounter with Hall was at first appearance, and that he recalled having a brief conversation with Hall at that time, but no mention was made of the facts of the case. There is no evidence in the record demonstrating that Hall informed Valerino during their brief conversation at first appearance that he was under the influence of drugs at the time of the murder.

Without having any notice about Hall's alleged drug use at first appearance or soon thereafter, trial counsel could not have had any way of knowing that a toxicology screen was needed. Upon learning that Hall had taken white pills, there was still no way for trial counsel to request a toxicology screen because Hall could not specify what kind of pills he had ingested. Presumably, had Hall exhibited any signs at first appearance evidencing he was still under the influence of drugs, trial counsel might then have requested a court-ordered toxicology screen. However, no mention was made about Hall exhibiting any type of unusual behavior that would have placed trial counsel on notice of the need for a drug screening. Moreover, the testimony of those closest to Hall immediately before and

---

2. Similarly, attorney Valerino testified that a toxicology screen was not requested because the attorneys did not know what substances Hall had taken and thus did not know what to ask the lab to test for.

immediately after the murder supports the assertion that Hall was not acting as though he was intoxicated.[3]

In light of trial counsel's lack of notice that a toxicology screen may have been warranted, attorneys Valerino and Phillips cannot be deficient for failing to request this screen. As the postconviction court noted, "Counsel cannot be considered deficient for failing to do something they could not do." Furthermore, counsel was not provided with discovery that revealed Prince's Tegretol blister pack until three weeks after the murder, at which point a drug screen would have been unreliable. Upon learning that Tegretol was found in Prince's office, counsel then diligently proceeded to hire Dr. Buffington to provide neuropharmacological testimony about the effects of the drug.

---

3. FDLE Special Agent Steven Miller stated that he did not order a toxicology screen because he "didn't feel it was necessary, nor was I the only person making that decision. I mean, we had a supervisor on scene, the deputy chief. And I was not the case agent on the investigation, but quite frankly, I wasn't sure what to believe. He—there was several—during the three interviews, there were several things that changed." Similarly, attorney Valerino, in explaining why the issue of stress was not presented to the jury, testified that multiple inmates were deposed and none mentioned that Hall had been acting differently the day of the murder. However, Inspector Joiner testified that Hall did not appear to be intoxicated, although "he seemed to be dazed" and impaired by a substance, such that drug testing may have been appropriate under DOC policy. Hall's demeanor improved as he gave the three separate interviews and he gradually became increasingly responsive to FDLE's questions.

Hall also contends that the State did not present any expert testimony at the evidentiary hearing to prove that no comprehensive toxicological test exists. This claim, however, ignores the fact that the defendant carries the burden to show that counsel's performance was deficient. See Robinson v. State, 707 So. 2d 688, 694 (Fla. 1998). Thus, it was Hall's responsibility, not the State's, to present testimony that such comprehensive toxicological tests do in fact exist and could have been utilized by trial counsel. Hall's claim attempts to establish trial counsel's deficiency by using the distorting effects of hindsight to allege error. We conclude that competent, substantial evidence supports the postconviction court's finding that counsel were not deficient.

Dr. Buffington's Testimony

Hall next asserts that trial counsel were deficient for failing to successfully present Dr. Buffington's neuropharmacological testimony by arguing that this testimony was relevant to prove motive, rather than a mental health defense.

We hold that Hall has once again failed to demonstrate that counsel was deficient. Competent, substantial evidence supports the postconviction court's finding that counsel's choice of argument was a strategic one and thus was not deficient. Hall asserts that counsel argued for the admission of this testimony based on the wrong legal justification, a mental health defense, and that this amounted to deficient performance. At its core, however, this alleged failure is

based on postconviction counsel's disagreement with trial counsel's strategic choice of argument, rather than trial counsel's failure to do something that any reasonable attorney would do under the norms of professional conduct.

Notably, although Hall contends that trial counsel failed to present Dr. Buffington's testimony to the jury, attorneys Valerino and Phillips <u>did</u> attempt to present Dr. Buffington's testimony by proffering his statement to Judge Walsh, but were simply unsuccessful. <u>See</u> <u>Bradley</u>, 33 So. 3d at 680 ("Although the strategy chosen by trial counsel . . . did not prevail, that fact alone does not render the strategy unreasonable or deficient."); <u>Heath v. State</u>, 3 So. 3d 1017, 1029 (Fla. 2009) ("The fact that this defense strategy was ultimately unsuccessful . . . does not render counsel's performance deficient."); <u>Henry v. State</u>, 948 So. 2d 609, 616 (Fla. 2006) ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . ." (quoting <u>Strickland</u>, 466 U.S. at 689)).

Attorney Valerino testified at the evidentiary hearing that he attempted to offer Dr. Buffington's testimony <u>to challenge premeditation</u>,[4] but the court found

---

4. During counsel's argument after the proffer, attorney Valerino explained the relevance of Dr. Buffington's testimony to the trial judge as follows:

> The testimony of Dr. Buffington is important because it goes to the issue of whether there was premeditation or not on the part of Mr. Hall at the time that this unfortunate incident occurred. According to

the argument to be one of diminished capacity due to mental illness, which was inadmissible at the guilt phase. Similarly, at the evidentiary hearing, when attorney Phillips was asked if he considered "offering Dr. Buffington to explain to a jury what Tegretol is, why you might want more, you know, motive for staying [behind]," Phillips explained, "[Y]ou know, first off, we would like Dr. Buffington to be able to testify to that, but I just don't think there is—there is a mechanism for that kind of testimony to come in during a—the guilt phase." Trial counsel's testimony reflects that they attempted to present Dr. Buffington's testimony to challenge premeditation, but were ultimately unsuccessful in doing so because the court ruled that the testimony was inadmissible. Additionally, attorney Phillips' opinion that this testimony would not have been admissible to show Hall's motive

_____

the testimony of Dr. Buffington, Mr. Hall identified to him . . . that he had taken Tegretol.

I think the testimony of Dr. Buffington shows that there are side effects of Tegretol. Some are naturally associated, such as headaches, dizziness, drowsiness, aggression, agitation, hallucinations, disturbance of balance, confusion, speech abnormality, depression with agitation, visual disturbance.

. . . And not only those side effects, but there's the potential side effects of the ability to unmask any underlying psychiatric conditions.

. . . .

So, again, we're not going for voluntary intoxication. We're not asking for an instruction on insanity. We're not asking for an instruction on mental health.

This, we believe, is relevant as to the issue of premeditation.

for staying late further exemplifies the reasoning for the argument presented after the proffer.  See Lukehart v. State, 70 So. 3d 503, 513 (Fla. 2011) ("Counsel cannot be deemed ineffective for failing to pursue a meritless claim." (citing Ferrell v. State, 29 So. 3d 959, 975 (Fla. 2010); Mungin v. State, 932 So. 2d 986, 997 (Fla. 2006))).

Therefore, we conclude that trial counsel were not deficient for failing to proffer Dr. Buffington's testimony by not arguing that it was relevant to explain Hall's motive for staying late to search for pills, rather than unmasking an underlying mental illness.

Inconsistencies in Hall's Confessions

Hall next alleges that trial counsel were deficient, both at the suppression hearing and the guilt phase of trial, for failing to present testimony and medical evidence of Hall's injuries to explain the inconsistencies in Hall's confessions.  We hold that Hall has failed to establish deficiency under this sub-claim.

*Suppression Hearing*

With regard to deficiency for failing to obtain and present expert medical testimony with regard to Hall's black eye and alleged limp, we conclude that competent, substantial evidence supports the postconviction court's finding that trial counsel were not deficient.  The record reflects that the injury that was primarily noticed by everyone who came into contact with Hall on the night of the

murder was his black eye.  When asked why no medical expert testimony was presented to attempt to explain when exactly might Hall have incurred the black eye, attorney Valerino offered the following testimony:

> Well, there was no doubt that Mr. Hall had a black eye, so I don't think that could be disputed.
> The problem was trying to develop testimony in light of the— some argument in light of the fact that all the corrections officers said they didn't hit him.
> Something that we could try to convince the judge that maybe they weren't absolutely honest, but we would never be able to prove the State—disprove the State's argument that Mr. Hall could have gotten these injuries, the black eye, in confrontation with Ms. Fitzgerald during the incident where she was killed.
> I mean, the reality of it was I did not believe Judge Walsh was going to believe all these corrections officers were lying about who— whether or not they hit Mr. Hall.

Valerino further supported his decision not to call a medical expert to testify about Hall's black eye, and compare its development to CO Fitzgerald's black eye to determine when the injury occurred, by explaining that he felt that he would not have been able to "draw a corollary between the two because Officer Fitzgerald was found with her head below her body, hanging upside-down, essentially, and that she was deceased, so the blood would not have been pooling the same way and along the same time lines."

Similarly, Hall contends that he was limping after the alleged injuries and that this limp was noted by a nurse who examined him the night of the murder and was also evident in a video of him being transported to Florida State Prison.

However, aside from the nurse who originally noted a limp, whose testimony was never presented, and Dr. Maher, who was retained for the evidentiary hearing, no other witness noted Hall's limp, including attorney Valerino, who briefly observed him walking at first appearance. FDLE Special Agent Steven Miller testified that Hall was shuffling his feet due to belly shackles, but did not seem to be in any pain.

Hall also presented a picture of his shoulders and back at the evidentiary hearing to show his bruised and scratched skin. Attorney Valerino testified that this photo was not presented during the suppression hearing because he did not feel that the photo definitively showed the existence of injuries. In sum, Hall asserts that these injuries could have been used, and explained through expert testimony, to corroborate his allegations of abuse. This assertion, however, is predicated on Hall's disagreement with trial counsel's underlying strategy and his ability to find a more favorable witness to testify at the evidentiary hearing.

Attorney Valerino testified that his strategy at the suppression hearing was to try to call into question the correction officers' testimony through cross-examination to ultimately argue the possibility that the officers were not being truthful. He considered presenting the picture of Hall's back and shoulders but did not find it to be persuasive. He also reviewed the video that Hall claims shows him using the wall to support himself and testified that he did not note Hall limping, but

he did notice that he was belly-shackled, chained at the ankles, and shuffling to walk in shower shoes. Attorney Valerino assessed the persuasiveness of the evidence he had available to him and attempted to anticipate any shortcomings that the State could capitalize on in deciding how to proceed at the suppression hearing.

We have observed that mere disagreement by a defendant's subsequent counsel with a strategic decision of a predecessor does not result in deficient performance. See Occhicone, 768 So. 2d at 1048. In addition, we have previously held that trial counsel's strategy of relying on cross-examination of a witness—in lieu of calling additional witnesses—was sound trial strategy. See id. Postconviction counsel's ability to find a more favorable witness for the evidentiary hearing has no bearing on the effectiveness of trial counsel's not having done so. Stephens v. State, 975 So. 2d 405, 413-14 (Fla. 2007).

The record reflects that counsel chose to elicit testimony on cross-examination to support the theory that Hall had been injured, through evidence establishing the timeline of when Hall's eye injury became noticeable to the officers, rather than relying on expert medical testimony that would likely be rebutted by the State. Counsel considered the possibility of introducing additional evidence of the injuries through the photo of Hall's back and the limp that was only noted by one person, despite Hall's encounter with multiple people on the night of the murder, yet he ultimately rejected these avenues as being

unpersuasive. Hall's current claim challenges trial counsel's strategic decisions at the suppression hearing and uses the more favorable testimony of Dr. Maher to support it. Based on attorney Valerino's testimony with regard to his actions at the suppression hearing, we hold that competent, substantial evidence supports the postconviction court's finding that counsel's conduct was justified as reasonable trial strategy, and thus Hall has failed to show deficiency at the suppression hearing.

*Guilt Phase*

With regard to the claim of deficiency for failing to present evidence of the alleged injuries to the jury and failing to obtain a mental health expert to testify as to the effects of fear, head trauma, epilepsy, cognitive disorders, and PTSD on memory to justify the inconsistencies in Hall's confessions, Hall has also failed to establish deficient performance. While no testimony was elicited from trial counsel at the evidentiary hearing about why a mental health expert did not testify to the effects that epilepsy, cognitive disorders, and PTSD might have on memory, attorney Phillips' testimony regarding his decision not to call Dr. Krop during the guilt or penalty phase provides some explanation. Throughout the trial, counsel was careful not to elicit any testimony concerning Hall's previous history of violent sexual offenses or his mental health issues in an attempt to not taint the jury's mind with potentially negative information. For example, Dr. Krop did not

testify at the penalty phase because trial counsel wanted to avoid the jury hearing the State's rebuttal mental health expert testimony, including Hall's paraphilia diagnosis and his inconsistent statements to the State's mental health expert.

Presumably, trial counsel did not want to elicit testimony with regard to Hall's numerous mental health issues because they did not want to taint the jury's mind, rather than supplement their case. Specifically, had trial counsel chosen to present this testimony, the State would likely have presented their rebuttal expert to testify about Hall's mental health issues, including his diagnosis of paraphilia, which could have significantly damaged the defense's case, rather than help explain the inconsistencies in Hall's confessions.

Attorney Valerino testified at the evidentiary hearing that he filed Hall's motion to suppress because he felt obligated to do so upon learning of Hall's allegations against the TCI officers, but that the suppression of Hall's confessions would have been problematic in light of their anticipated theory of defense. Once the motion to suppress was denied, trial counsel chose to pursue a different theory for Hall's trial than they had during the suppression hearing. Counsel made the strategic decision not to present the alleged abuse to the jury because they felt that it was inconsistent with the theory they were presenting. Specifically, at the evidentiary hearing, Valerino explained:

> [State]: But because your ultimate strategy was just that the
> State didn't prove its ultimate case and you were having to rely on

Enoch Hall's version of events, you didn't want to really attack his statements as to any inconsistencies because you were relying on his statements; is that a fair—

　　[Attorney Valerino]: Right. And that's why I didn't want to bring up issues about his statement was coerced or things of that nature <u>because our theory was he freely and voluntarily spoke with the police</u>.

(Emphasis added.)

Attorney Valerino had a similar explanation for why he chose not to present evidence to the jury of the effect that fear and head trauma from beatings could have on memory. He also explained the confession inconsistencies as being due to Hall's attempts to clarify his statements as he remembered more about what had transpired. Thus, counsel justified his reasoning for not presenting evidence of the injuries to the jury as being a reasonable strategic decision that was consistent with the theory of defense presented. We conclude that Hall has failed to establish deficiency in light of the pervasive evidence in the record that trial counsel's actions were strategic and reasonable.

## CO Evins' Testimony

Hall's next claim contends that trial counsel was ineffective for failing to object to CO Evins' trial testimony concerning the procedures that he followed when closing down the PRIDE overtime shift because he was not listed on the State's witness list and only testified about the procedures that he personally

followed in closing down PRIDE, rather than those that CO Fitzgerald and all supervising PRIDE officers followed. We disagree.

Frederick Evins, who testified at trial for the State, worked the overtime shift at PRIDE around the time of the murder. CO Evins testified as to the procedures he followed when closing down the PRIDE overtime shift, which included locking up all tools and offices before closing and searching all inmates before dismissing them. Evins testified that he noticed that Hall had developed a habit of being the last inmate to leave PRIDE, but he would never allow an inmate to stay behind after the supervising officer left. Evins also testified that Hall usually worked alongside another welder. When Hall was late coming to check out, the other welder he worked with was, on occasion, also one of the last inmates to check out of PRIDE.

Deficiency

Hall has failed to establish deficiency for this claim. Competent, substantial evidence supports the postconviction court's finding that trial counsel was not deficient for failing to object to CO Evins' testimony at trial. The record shows that, although CO Evins was not listed on the State's witness list before trial, attorneys Valerino and Phillips were not surprised by Evins' testimony because they had already deposed him for their own mitigation investigation and thus had knowledge of the substance of his testimony before trial. Moreover, attorney

Valerino testified at the evidentiary hearing that he did not object to CO Evins'

testimony because he "did not feel that his testimony was objectionable." Attorney

Valerino explained that he would have objected, had he felt that the testimony was

irrelevant or had some valid theory under which to do so.

This Court, in Brown v. State, 846 So. 2d 1114, 1122 (Fla. 2003), agreed

with the trial judge's finding that counsel was not deficient for failing to object to

the statements made by a witness because he found that counsel's failures to object

were "trial tactics on his part not to object to what he perceived as very minor

hearsay matters." Id.[5] We ultimately agreed with the trial court that counsel's

decisions not to object were strategic and thus not deficient, stating:

> We concur in the trial court's evaluation that, considering trial
> counsel's philosophy, it does not appear to be deficient performance
> on his part not to object. "Counsel's strategic decisions will not be
> second-guessed on collateral attack." Johnson v. State, 769 So. 2d
> 990, 1001 (Fla. 2000) (citing Remeta v. Dugger, 622 So. 2d 452 (Fla.
> 1993)).

Id.; see also Peterson v. State, 154 So. 3d 275, 280 (Fla. 2014) (counsel is not

deficient for failing to raise a meritless objection).

---

5. Similarly, the trial court in Brown also found that "counsel was not
deficient in failing to object to the prosecutor's statements. Noting counsel's
hearing testimony in which he stated that being judicious with his objections is a
part of his style, in order to avoid antagonizing the jury and losing credibility, the
court found no demonstration of ineffectiveness or prejudice." Brown, 846 So. 2d
at 1122.

Hall further argues that CO Evins' testimony was irrelevant because PRIDE officers received no formal training and there were no administrative procedures for PRIDE officers to follow. Thus, CO Evins' testimony only reflected his own individual closing procedures, rather than those of PRIDE officers as a whole. This assertion, however, disregards the internal operating practice that, while PRIDE officers may have received no formal training, training procedures are in fact informally passed down from previous PRIDE supervisors. This sheds light on the relevance of CO Evins' testimony by providing circumstantial evidence of informal procedures that are passed down from one officer to another. In light of this informal training, CO Evins' testimony could reflect the possible procedures that CO Fitzgerald used to close down PRIDE on the night of the murder, based on these verbally transmitted training procedures. Thus, we conclude that trial counsel was not deficient for failing to object to CO Evins' testimony at trial because it was a reasonable strategic decision.

## Prejudice

Even if counsel was deficient for failing to object to CO Evins' testimony, Hall has failed to show that this deficiency prejudiced the outcome of his case. Had this objection been sustained and Evins' testimony not been presented to the jury, the outcome of Hall's case would likely have been the same because Evins' brief testimony did not lay any foundation to establish the State's case of

premeditation. While Hall contends that the lack of this testimony would have allowed counsel to challenge the State's theory of premeditation, this again ignores Hall's own confession that, after being confronted by CO Fitzgerald in Prince's office while Hall was looking for pills, he ran and hid in the welding shed with Prince's shank, knowing that she was looking for him, and stabbed her to death once she found him. Hall's anticipation that CO Fitzgerald was coming to look for him alone and unarmed was not what established the State's theory of premeditation; rather, Hall's own rendition of what happened on the night of the murder established premeditation. Thus, the outcome of Hall's case would likely have been the same even without CO Evins' testimony. Therefore, we conclude that Hall was not prejudiced by counsel's failure to object, and this claim of ineffective assistance fails.

**Mitigation Investigation**

Hall next asserts that trial counsel were ineffective for failing to adequately investigate and present mitigating evidence at the penalty phase. We disagree.

Deficiency

First, Hall has failed to establish deficiency. "An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence," but not necessarily to run down every possible lead. Sochor, 883 So. 2d at 772 (quoting Rose v. State, 675 So. 2d

567, 571 (Fla. 1996)). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Taylor v. State, 3 So. 3d 986, 998 (Fla. 2009) (quoting Wiggins v. Smith, 539 U.S. 510, 533 (2003)). Furthermore, as the Supreme Court noted in Strickland, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691. We have previously concluded that trial counsel is not ineffective for failing to discover mitigation that the defendant and his family have concealed. Asay v. State, 769 So. 2d 974, 987-88 (Fla. 2000) (finding no ineffectiveness for failing to discover that the defendant was sexually abused when the defendant and his family were not forthcoming with the information, even though trial counsel was aware of the defendant's rough childhood); Diaz v. State, 132 So. 3d 93, 114 (Fla. 2013) (finding no ineffectiveness for failing to discover information regarding sexual abuse that Diaz and his family did not disclose).[6]

_____

6. For additional cases where the defendant either failed to disclose mitigation or instructed counsel not to conduct a penalty phase investigation, see Reed v. State, 640 So. 2d 1094, 1097 (Fla. 1994) ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.") (quoting Strickland, 466 U.S. at 691); Bryan v. State, 748 So. 2d 1003, 1007 (Fla. 1999) (finding Bryan's ineffective assistance of

- 38 -

Competent, substantial evidence supports the postconviction court's finding that trial counsel's investigation into Hall's family background was comprehensive and thus not deficient. The record supports the assertion that trial counsel, Investigator Ryan, and Dr. Krop all, whether individually or together, traveled to Hall's hometown to interview his family, friends, and old coaches, extensively searched the Florida Panhandle for any records that could serve as mitigation, and presented testimony of relatives and friends to the jury to establish mitigation at the penalty phase. Despite numerous interviews with Hall's parents and brother, no information surfaced with regard to adverse consequences related to his mother's infidelity, even when Hall's father was briefly asked about his divorce.

Hall's current claim exists only because he and his family were not forthcoming with information concerning his mother's infidelity and because Hall specifically asked that Investigator Ryan not contact certain family members. Nevertheless, trial counsel still provided effective representation by continuing to investigate other avenues of mitigation, and doing so in such a diligent manner that they were able to recover records concerning Hall's alleged rape in Escambia County Jail, despite encountering numerous hurdles along the way. Cf. Ventura v. State, 794 So. 2d 553, 570 (Fla. 2001) (finding counsel deficient for relying on the

counsel claim was properly denied because he failed to provide his counsel with the mitigating facts).

defendant as the <u>sole source</u> for mitigation after the defendant instructed counsel not to involve his family in his trial).

Hall relies on two cases to show that trial counsel's mitigation investigation was not reasonable: <u>Sears v. Upton</u>, 561 U.S. 945 (2010), and <u>Ferrell v. Hall</u>, 640 F.3d 1199 (11th Cir. 2011). We find both of these cases to be distinguishable from Hall's case. In <u>Sears</u>, counsel was found deficient for presenting evidence of Sears' "ideal" childhood, when Sears was in fact seriously intellectually disabled and was verbally, physically, and emotionally abused as a child. <u>Sears</u>, 561 U.S. at 946, 948. This is distinguishable from Hall's case because Hall's counsel presented accurate mitigation about his childhood, but simply failed to discover and present his mother's infidelity. Moreover, in <u>Ferrell</u>, counsel was deficient because of a failure to uncover pervasive mental health mitigation, despite clear signs in the medical and academic records, due to the seriously limited investigation and questioning by the defense team and mental health expert. <u>Ferrell</u>, 640 F.3d at 1227-28. Conversely, here, Hall's defense team conducted extensive questioning, mental health testing, and investigation without limiting their search, but were still unsuccessful in uncovering his mother's infidelity or any alleged adverse consequences. We conclude that the cases Hall relies on are inapposite and that trial counsel were not deficient for failing to uncover evidence of Hall's mother's infidelity in light of the comprehensive investigation conducted.

Prejudice

Even if trial counsel was deficient for failing to adequately investigate Hall's family history, we hold that Hall has failed to establish prejudice. "To assess [the] probability [of a different outcome under Strickland], we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [evidentiary hearing]—and reweig[h] it against the evidence in aggravation." Sears, 561 U.S. at 955-56 (first, second, and fourth alterations in original) (quoting Porter v. McCollum, 558 U.S. 30, 41 (2009)). "[T]his Court has reasoned that where the trial court found substantial and compelling aggravation, such as commission while under sentence of imprisonment, prior violent felonies, commission during a burglary, and CCP, there was no reasonable probability that the outcome would have been different had counsel presented additional mitigation evidence . . . ." Asay, 769 So. 2d at 988.

In Hall's case, the trial court found five aggravators: (1) previously convicted of a felony and under sentence of imprisonment; (2) previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (3) committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; (4) especially heinous, atrocious or cruel; (5) cold, calculated, and premeditated (CCP); (6) the victim of the capital felony was a law enforcement officer engaged in the performance of his

- 41 -

or her official duties—merged with aggravator number 3. We later rejected the CCP aggravator on direct appeal. However, each of the four remaining aggravators were afforded great weight or very great weight. Given the significant aggravators found against Hall, and the comparatively weak mitigation found, it is unlikely that evidence of Hall's mother's infidelity, and Hall's alleged resulting hostility towards women, would have sufficed to outweigh the established aggravation. Therefore, we conclude that Hall's case was not prejudiced by trial counsel's failure to further investigate and present Hall's family background.

**Failure to Present Dr. Krop**

Hall's next claim contends that trial counsel were ineffective for failing to present the expert mental health testimony of Dr. Krop during the penalty phase. We disagree.

Deficiency

Hall has failed to establish deficiency with regard to this claim. Competent, substantial evidence supports the postconviction court's finding that trial counsel was not deficient for failing to call Dr. Krop to testify as to mental mitigation in light of his negative testimony about Hall and the potential for the jury's exposure to even more negative evidence through the State's rebuttal expert.

After the jury returned Hall's guilty verdict, the State's rebuttal expert, Dr. Danziger, interviewed Hall. In preparation for his final meeting with Hall, Dr.

Krop reviewed Danziger's interview and identified several inconsistencies in the statements made by Hall to both experts, such as his motive for pulling CO Fitzgerald's pants down and how many pills he had ingested on the night of the murder. When confronted with these inconsistencies, Hall admitted that he had considered raping Fitzgerald after he had killed her. Attorney Phillips met with appellate attorney Chris Quarles and Dr. Krop to discuss whether these new statements changed Dr. Krop's testimony. In his memo to the file, Dr. Krop explained:

> The following is a summary of a "strategy" meeting involving Mr. Hall's attorneys, Dr. Buffington, and myself held on October 27th, 2009. Based on extensive discussion, it was decided that testimony from this expert would most likely be detrimental to Mr. Hall in that the negatives would far outweigh any possible assistance.

Ultimately, the defense team made the decision not to present Dr. Krop, in light of Hall's harmful statements and Dr. Danziger's opinion that Hall was malingering and had paraphilia, not otherwise specified.

Hall relies on a number of cases in support of his assertion that counsel's actions concerning Dr. Krop were unreasonable. However, the cases presented fail to address the issue of whether counsel's strategic decision not to present mental mitigation was reasonable under the circumstances. Instead, the cases Hall relies on in support of his claim involve situations where counsel failed to investigate or develop any mental mitigation, despite the clear warnings that this mitigation

- 43 -

existed.  Hildwin,[7] Orme,[8] and Willacy[9] all involve the total failure of counsel to investigate mental health mitigation that existed and the resulting failure to present this mitigation to the jury, rather than counsel's strategic decision not to call certain potentially harmful witnesses.  Duncan[10] involved trial counsel failing to call his previously hired mental health expert to testify as to mental mitigation.  Unlike in Hall's case, the Court in Duncan found no evidence in the record to support the failure to present this mental health expert, nor could counsel justify his decision not to do so at the evidentiary hearing.  Duncan, 894 So. 2d at 825-26.

Conversely, counsel in the present case made the strategic decision not to present Dr. Krop during the penalty phase based on Krop's damaging testimony about Hall's inconsistent statements to the State's mental health expert, his statements that he considered raping CO Fitzgerald after he murdered her, his statements that he was plotting to escape with CO Fitzgerald's uniform, and his varying statements concerning how many pills he consumed on the day of the murder.  Counsel's ultimate decision was not unreasonable based on the evidence in the record and the testimony from the evidentiary hearing; rather, it was a

7.  Hildwin v. Dugger, 654 So. 2d 107 (Fla. 1995).

8.  Orme v. State, 896 So. 2d 725 (Fla. 2005).

9.  Willacy v. State, 967 So. 2d 131 (Fla. 2007).

10.  State v. Duncan, 894 So. 2d 817 (Fla. 2004).

calculated decision aimed at avoiding exposing the jury to further damaging testimony that could be considered additional aggravation.

We hold that Hall's case is more comparable to that of Gaskin v. State, 822 So. 2d 1243 (Fla. 2002), because in Gaskin, the expert similarly warned trial counsel that his testimony would likely be damaging due to Gaskin's extensive criminal history, sexual deviancy, and lack of remorse. Id. at 1248. Counsel in Gaskin assessed the pros and cons of presenting the expert in light of his damaging testimony and ultimately decided not to use the witness due to the risk that the jury would consider Gaskin's negative past as aggravation. Id. In Gaskin, we found this to be a reasonable strategic decision because counsel did, in fact, conduct a diligent mental health mitigation investigation, but later made the strategic decision not to present that mitigation witness to the jury. Id.

> Trial counsel will not be held to be deficient when she makes a reasonable strategic decision not to present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony. See Ferguson v. State, 593 So. 3d 508, 510 (Fla. 1992) (finding that counsel's decision to not put on mental health experts was a "reasonable strategy in light of the negative aspects of the expert testimony" because the experts had indicated that they thought that the defendant was malingering, a sociopath, and a very dangerous person).

Id. at 1248. We conclude that the decision on this expert witness was a reasonable strategic decision, in light of the circumstances, and hold that Hall has failed to establish deficiency.

Prejudice

Hall has also failed to establish prejudice for this claim. Due to the significant aggravation in Hall's case, there is no reasonable probability that Dr. Krop's testimony regarding his mental health diagnoses would have outweighed the substantial and compelling aggravation. It is more likely that the jury would have heard Dr. Krop's testimony and the State's rebuttal mental health expert's testimony and decided that the testimony justified finding further aggravation.

Therefore, we conclude that trial counsel's failure to call Dr. Krop to present evidence that would include damaging mental evidence did not prejudice the outcome of Hall's case and Hall's claim thus fails.

**Extreme Mental and Emotional Disturbance Instruction**

Hall's next claim contends that trial counsel were ineffective for failing to request the statutory mitigating instruction of extreme mental and emotional disturbance. We disagree.

Deficiency

Hall has failed to establish trial counsel's deficiency with regard to this claim. Competent, substantial evidence supports the postconviction court's finding that trial counsel was not deficient for failing to request the statutory mitigating instruction for extreme mental and emotional disturbance. We have previously held:

[T]he "Defendant is entitled to have the jury instructed on the rules of law applicable to this theory of the defense if there is any evidence to support such instructions." Hooper v. State, 476 So. 2d 1253, 1256 (Fla. 1985), cert. denied, 475 U.S. 1098 (1986) (emphasis added); Smith v. State, 492 So. 2d 1063 (Fla. 1986). Regarding mitigating factors dealing with extreme mental or emotional disturbance, we have stated that where a defendant has produced any evidence to support giving instructions on such mitigating factors, the trial judge should read the applicable instructions to the jury. Toole v. State, 479 So. 2d 731 (Fla. 1985).

Bryant v. State, 601 So. 2d 529, 533 (Fla. 1992) (emphasis in original) (footnote omitted).

The State and the postconviction court correctly compare Hall's case to

Nelson v. State, 43 So. 3d 20 (Fla. 2010), where trial counsel was not found to be

ineffective for failing to request the statutory mitigating instruction of extreme

mental or emotional disturbance because it was a reasonable tactical decision based

on counsel's concern that the State would successfully argue that this mitigation

was not established. Id. at 32. Postconviction counsel in Nelson attempted to

argue that trial counsel's strategy was not reasonable because it was based on

ignorance of controlling case law. Id.

Similarly, here, Hall alleges that counsel's failure to request this mitigating

instruction was also based on ignorance rather than strategy. However, the record

reflects otherwise. As discussed above, counsel made a strategic decision not to

present Dr. Krop to address mental mitigation. Furthermore, Dr. Buffington's

testimony at the penalty phase was limited only to the potential side effects that

Tegretol could produce, although counsel had originally hoped that Dr. Buffington would also testify that Tegretol may have unmasked Hall's underlying mental illness on the night of the murder. Consequently, counsel did not have the predicate evidence needed to support the request for the statutory mitigating instruction of extreme mental and emotional disturbance and thus decided to use the "catch all" instruction under the circumstances. See Looney v. State, 941 So. 2d 1017, 1030 (Fla. 2006) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." (quoting Howell v. State, 877 So. 2d 697, 703 (Fla. 2004))). Therefore, we conclude that Hall has failed to establish trial counsel's deficiency for failing to request this statutory mitigating instruction.

Prejudice

Even if counsel were deficient in failing to request the statutory mitigating instruction of extreme mental or emotional disturbance, Hall has also failed to establish prejudice. Competent, substantial evidence supports the postconviction court's conclusion that this failure did not prejudice Hall. Even if the instruction had been given, the outcome in Hall's case still would not have changed because the State presented significant evidence to disprove that Hall was under any mental or emotional disturbance on the night of the murder. Thus, Hall cannot establish a

reasonable probability that this instruction would have changed the jury's decision to recommend the death penalty and our confidence is not undermined. Moreover, as discussed above, given the substantial aggravation found in Hall's case, it is highly unlikely that the finding of the extreme mental or emotional disturbance mitigator would have shifted the balance of the significant aggravation. Therefore, we find that Hall has failed to establish that the outcome of his case was prejudiced by the lack of this instruction and thus this claim fails.

**Hall's Medical History**

Hall's next claim argues that trial counsel were ineffective for failing to bring Hall's medical history of epilepsy to Dr. Krop's attention through Hall's Department of Corrections (DOC) medical records, where he self-reported experiencing a seizure in 2002, despite having no medical documentation of any seizures in his records since 1995. Hall claims that trial counsel's failure to explicitly point this fact out to Dr. Krop amounted to ineffective assistance of counsel. We disagree.

Deficiency

First, we conclude that Hall has failed to establish deficiency with regard to this claim. We note that Hall's brief merely incorporates the arguments made under Issues 2, 4, and 5, rather than providing any independent analysis to support

this claim.[11]  Due to our conclusions above, we similarly conclude here that Hall has failed to establish either deficiency or prejudice.  Additionally, because Hall did not present Dr. Krop to testify at the postconviction hearing as to what evidence he did or did not consider in his analysis, Hall has failed to meet his burden of proof on this issue.  Nevertheless, in reviewing this claim on the merits, we hold that competent, substantial evidence supports the postconviction court's finding that counsel was not deficient because Dr. Krop had the information at issue and there is no evidence that he did not consider this information in making his report.

Hall has provided no evidence in support of his claim that Dr. Krop failed to review and consider Hall's previous diagnoses of epilepsy and psychosis in making his findings.  Furthermore, the record shows that counsel provided Dr. Krop with

---

11.  While we have nonetheless analyzed this claim, this Court has previously commented on parties' failure to offer arguments in support of their claims.  As we explained in Bradley, 33 So. 3d at 685,

> vague and conclusory allegations are insufficient to warrant relief. See Doorbal v. State, 983 So. 2d 464, 482 (Fla. 2008) ("[T]o merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient . . . and these claims are deemed to have been waived."); Thompson v. State, 759 So. 2d 650, 668 (Fla. 2000) (denying habeas claim, in part, as legally insufficient because defendant made only a conclusory statement without specific supporting facts).  The purpose of a legal brief is to offer argument in support of the issues raised on appeal.  See Doorbal, 983 So. 2d at 482.

all of Hall's medical records, including the DOC records that reflected Hall's report of a 2002 seizure. Hall now attempts to present Dr. Maher's more favorable diagnosis of epilepsy in support of his claim of ineffective assistance of counsel. Based on counsel's comprehensive investigation in developing mitigation and the fact that Dr. Krop had the records that Hall now claims were disregarded, we hold that Hall's claim of deficiency is meritless.

Prejudice

Furthermore, Hall has failed to establish prejudice. Competent, substantial evidence supports the postconviction court's findings that trial counsel's actions did not prejudice Hall. Hall's current claim seemingly ignores the fact that counsel chose not to have Dr. Krop testify at the penalty phase, due to his unfavorable testimony with regard to the inconsistent statements Hall made to Dr. Danziger, Hall's paraphilia disorder, and his statement that he considered raping CO Fitzgerald after he murdered her. In light of this fact, Hall cannot demonstrate that he was prejudiced by the allegedly flawed investigation because Dr. Krop's testimony would not have been presented to the jury regardless. None of the additional evidence that Hall uses to justify his claim would dispel trial counsel's concerns with regard to Dr. Krop's potentially harmful testimony. Further, Hall's diagnoses of epilepsy and psychosis were disputed by the State's mental health expert, Dr. Danziger. Hall simply has provided no evidence to support his

argument that this testimony reasonably could have caused the jury to recommend a life sentence rather than the death penalty. Therefore, we conclude that Hall has failed to establish prejudice under Strickland in light of both the analysis in this section and our conclusions in the issues discussed above.

**Cumulative Error**

Hall further contends that the postconviction court erred in finding that he was not deprived of a fair trial as a result of cumulative errors during both the guilt and penalty phases. We disagree. This Court has repeatedly held that, "where the individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error also necessarily fails." See Israel v. State, 985 So. 2d 510, 520 (Fla. 2008) (quoting Parker v. State, So. 2d 370, 380 (Fla. 2005)); see also Griffin v. State, 866 So. 2d 1, 22 (Fla. 2003). In addition, individual claims that fail to meet the Strickland standard for ineffective assistance of counsel are also insufficient to establish cumulative error. See Israel, 985 So. 2d at 520.

As discussed above, Hall has failed to demonstrate that the postconviction court erred in finding that no Strickland error occurred. As a result, Hall has not alleged a proper basis for cumulative error.

**Incompetence at the Time of Execution**

Hall asserts that his Eighth Amendment right under the United States Constitution against cruel and unusual punishment will be violated because he may

be incompetent at the time of execution. We find that this claim is not ripe for consideration. Individuals who lack the mental capacity to understand their pending execution and the reasons for it cannot be executed. Fla. R. Crim. P. 3.811; see Barnes v. State, 124 So. 3d 904, 918 (Fla. 2013). However, claims of future incompetence are not ripe for decision until a death warrant has been issued for a given individual. See Fla. R. Crim. P. 3.811(c) ("No motion for a stay of execution pending hearing, based on grounds of the prisoner's insanity to be executed, shall be entertained by any court until such time as the Governor of Florida shall have held appropriate proceedings for determining the issue pursuant to the appropriate Florida Statutes."); Barnes, 124 So. 3d at 918 ("We have repeatedly held that this claim may not be asserted until a death warrant has been issued."); Israel, 985 So. 2d at 521-22 ("Israel conceded that this claim is not ripe for review . . . . He contends that he is only raising this issue for preservation purposes. This Court has repeatedly found that no relief is warranted on similar claims."). No warrant has been signed in this case. We therefore reject Hall's claim as not ripe for review.

**Petition for Writ of Habeas Corpus**

Constitutionality of Section 921.141, Florida Statutes (2008)

In his habeas petition, Hall first asserts that appellate counsel was ineffective for failing to challenge the constitutionality of section 921.141, Florida Statutes

- 53 -

because: (1) it is facially vague and overbroad in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and (2) the trial court's instructions to the jury unconstitutionally diluted its sense of responsibility in determining the proper sentence. We disagree.

Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of counsel, this Court must determine

> first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986); see also Freeman, 761 So. 2d at 1069; Thompson, 759 So. 2d at 660. In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So. 2d at 1069; see also Knight v. State, 394 So. 2d 997, 1001 (Fla. 1981). Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000).

- 54 -

With regard to challenges to the standard jury instructions in death penalty cases, this Court has repeatedly held that

> challenges to "the standard jury instructions that refer to the jury as advisory and that refer to the jury's verdict as a recommendation violate Caldwell v. Mississippi, 472 U.S. 320 (1985)" are without merit.  Card v. State, 803 So. 2d 613, 628 (Fla. 2001); see also Brown v. State, 721 So. 2d 274, 283 (Fla. 1998) (holding that the standard jury instructions fully advise the jury of the importance of its role, correctly state the law, do not denigrate the role of the jury, and do not violate Caldwell); Rose v. State, 617 So. 2d 291, 297 (Fla. 1993) (rejecting the claim that the sentencing jury was misled by instructions and argument that diluted their sense of responsibility pursuant to the rationale of Caldwell and that counsel was ineffective for failing to object because the jury instructions correctly informed the jury of its sentencing role); Mendyk v. State, 592 So. 2d 1076, 1080-81 (Fla. 1992) (rejecting Mendyk's position that counsel was ineffective for failing to object to an alleged Caldwell violation).

Dufour, 905 So. 2d at 67.

"If a legal issue 'would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Id. at 71 (quoting Rutherford, 774 So. 2d at 643).  Due to the clear and extensive case law that establishes that claims challenging the constitutionality of the standard jury instructions, as they apply to the jury's advisory role, are entirely without merit, we conclude that appellate counsel was not ineffective for failing to raise this meritless claim and thus deny Hall relief on this claim.

- 55 -

Florida's Unconstitutional Capital Sentencing Scheme

During the pendency of Hall's postconviction appeal, the United States Supreme Court issued Hurst v. Florida, 136 S. Ct. 616 (2016), in which it held that Florida's capital sentencing scheme violated the Sixth Amendment. Id. at 621. The Supreme Court in Hurst concluded that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." 136 S. Ct. at 619. On remand from the Supreme Court, we held that "before a sentence of death may be considered by the trial court in Florida, the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances." Hurst v. State, 202 So. 3d 40, 53 (Fla. 2016). We further held that a unanimous jury recommendation is required before a trial court may impose a sentence of death. See id. at 53-54. Finally, this Court determined that Hurst error is capable of harmless error review. See id. at 67. Recently, in Mosley v. State, 41 Fla. L. Weekly S629 (Fla. Dec. 22, 2016), we further held that our decision in Hurst v. State applies retroactively to those postconviction defendants whose sentences were final after the United States Supreme Court's 2002 decision in Ring v. Arizona, 536 U.S. 584 (2002). See Mosley, 41 Fla. L. Weekly at S638 ("We conclude that . . . Hurst [v. State] should be applied to . . . defendants whose

- 56 -

sentences became final after the United States Supreme Court issued its opinion in Ring.").

Accordingly, because Hall's sentence became final on October 7, 2013, when the United States Supreme Court denied Hall's petition for certiorari, Hall, 134 S. Ct. 203, we must consider whether any Hurst error during Hall's penalty phase proceedings was harmless beyond a reasonable doubt. In Hurst v. State, this Court explained the standard by which harmless error should be evaluated:

> Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000). Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," [State v.] DiGuilio, 491 So. 2d [1129,] 1137 [Fla. 1986], and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a Hurst error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

>> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

> DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

- 57 -

Id. at 68 (third alteration in original). Finally, in Davis v. State, 41 Fla. L. Weekly S528 (Fla. Nov. 10, 2016), we determined that a Hurst error was harmless beyond a reasonable doubt and reiterated that "[a]s applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances." Id. at S539.

When the jury recommended that Hall be sentenced to death, it did not make specific factual findings with regard to the existence of any aggravating circumstances, nor did it make any findings with regard to the relative weight of the aggravating and mitigating circumstances. Therefore, we conclude that Hall's sentence was contrary to Hurst v. Florida.

However, as in Davis, we conclude that this is one of those rare cases in which the Hurst error was harmless beyond a reasonable doubt. We initially must emphasize the unanimous jury recommendation of death in this case. This unanimous recommendation lays a foundation for us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors. The instructions that were given informed the jury that it needed to determine whether sufficient aggravators existed and whether any aggravation outweighed the mitigation before

it could recommend a sentence of death.  See Fla. Std. Jury Instr. (Crim.) 7.11 (2009) ("[T]he final decision as to what punishment shall be imposed is the responsibility of the judge; however, it is your duty to follow the law that will now be given you by the court and render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.").[12]

_____

12.  The jury was also presented with evidence of mitigating circumstances and was properly informed that it could consider mitigating circumstances if it was reasonably convinced that the mitigating circumstances existed.  See Fla. Std. Jury Instr. (Crim.) 7.11 (2009) ("A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant.  If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established.").  Although the standard jury instructions used in Hall's case were different from the ones currently in place, we explained the 2009 amendments to the burden of proof for mitigating circumstances as follows:

> Although the current and proposed instructions provide that the jury need only be "reasonably convinced" that a mitigating circumstance exists, our case law has stated this burden in terms of the greater weight of the evidence or in terms of a preponderance of the evidence which are synonymous.  We conclude that the better terminology for this standard is the more widely accepted "greater weight of the evidence," which means "more likely than not," and we have made the appropriate changes in the instruction.

In re Standard Jury Instructions in Criminal Cases – Report No. 2005-2, 22 So. 3d 17, 21 (Fla. 2009) (citations omitted).

Even though the jury was not informed that the finding that sufficient aggravating circumstances outweighed the mitigating circumstances must be unanimous, and even though it was instructed that it was not required to recommend death even if the aggravators outweighed the mitigators, the jury did in fact recommend death unanimously. See id. ("Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances."); Trial T. 3593 ("Regardless of your findings with respect to aggravating and mitigating circumstance, you are never compelled nor required to recommend a sentence of death."). From these instructions, we conclude that the jury unanimously made the requisite factual findings to impose death before it issued the unanimous recommendation. Further supporting our conclusion that any Hurst error here was harmless are the egregious facts of this case—Hall, who was already imprisoned for four different rapes, hid from a corrections officer while armed with a shank, stabbed her twenty-two times when she found him, cracking multiple ribs and puncturing her heart, and then moved her body to a different location, bent her over a paint cart, and pulled down her pants and underwear. The evidence in support of the four aggravating circumstances[13] found as to CO

---

13. (1) Previously convicted of a felony and under sentence of imprisonment; (2) previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (3) committed to disrupt or

Fitzgerald's death was significant and essentially uncontroverted. Three of the four aggravators were without and beyond dispute.

Presuming that the jury did its job as instructed by the trial court, we are convinced that it would have still found that the aggravators greatly outweighed the mitigators in this case. Indeed, it is inconceivable that a jury would not have found the aggravation in Hall's case unanimously, especially given the fact that three of the aggravators found were automatic (i.e., under sentence of imprisonment, previously convicted of another violent felony, and the victim was a law enforcement officer).

Furthermore, Hall's claim that Florida's capital sentencing scheme is unconstitutional because it creates a presumption of death in any case where a single aggravator applies is also meritless.

> This Court has rejected the argument that Florida's capital sentencing scheme is unconstitutional because it provides for an automatic aggravating circumstance and neither "narrow[s] the class of persons eligible for the death penalty" nor "reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Parker v. State, 873 So. 2d 270, 286 n.12 (Fla. 2004) (alterations in original) (quoting Zant v. Stephens, 462 U.S. 862, 877 (1983)); see Blanco v. State, 706 So. 2d 7, 11 (Fla. 1997). As this Court pointed out in Blanco, this claim is meritless:

---

hinder the lawful exercise of any governmental function or the enforcement of laws; (4) especially heinous, atrocious or cruel; and (5) the victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties, which was merged with aggravator number 3.

> Eligibility for this aggravating circumstance is not automatic: The list of enumerated felonies in the provision defining felony murder is larger than the list of enumerated felonies in the provision defining the aggravating circumstance of commission during the course of an enumerated felony.

Id. at 11 (footnote omitted); see also Francis v. State, 808 So. 2d 110, 136 (Fla. 2001).

> Miller's other claims have previously been held to be meritless. See Proffitt v. Florida, 428 U.S. 242, 255-56 (1976) (upholding constitutionality of Florida's death penalty statute against multiple challenges, including challenge [sic] based on vagueness and overbreadth of aggravating and mitigating circumstances and the lack of guidance for the jury in weighing such factors); Lugo v. State, 845 So. 2d 74, 119 (Fla. 2003) (reiterating that this Court has "rejected the claim that the death penalty system is unconstitutional as being arbitrary and capricious because it fails to limit the class of persons eligible for the death penalty").

Miller v. State, 926 So. 2d 1243, 1260 (Fla. 2006). Therefore, we deny Hall's claims relating to the unconstitutionality of the death penalty, and specifically hold that any Hurst error with regard to Hall's sentence, which was based upon a unanimous recommendation of death, is harmless beyond a reasonable doubt.

## CONCLUSION

For the reasons discussed, we affirm the postconviction court's denial of Hall's postconviction motion and deny his petition for a writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and LEWIS, J., concur.
PARIENTE, CANADY, and POLSTON, JJ., concur in result.
QUINCE, J., concurs in part and dissents in part with an opinion.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

QUINCE, J., concurring in part and dissenting in part.

I agree with the majority's decision to affirm the postconviction court's denial of Hall's postconviction motion. I dissent, however, to the decision to deny Hall's petition for a writ of habeas corpus and would find that the Hurst error in this case was not harmless beyond a reasonable doubt.

In Hurst v. State, 202 So. 2d 40 (Fla. 2016), we held that for a defendant to be eligible for the death sentence, a jury must unanimously find the existence of each aggravating factor, that the aggravating factors are sufficient, and that the aggravating factors outweigh the mitigating circumstances. Hurst, 202 So. 3d at 44. Additionally, we held that the jury's death sentence recommendation must be unanimous. Id. While I agreed in Hurst that errors under Hurst v. Florida, 136 S. Ct. 616 (2016), are subject to harmless error review, see Hurst, 202 So. 3d at 68, I do not believe that we can ever find Hurst error harmless when there are aggravating circumstances that require a factual determination based on evidence presented to the jury. Because Hurst requires "a jury, not a judge, to find each fact necessary to impose a sentence of death," Hurst v. Florida, 136 S. Ct. at 619, the error cannot be harmless where such a factual determination was not made.

- 63 -

The aggravating circumstances in this case were: (1) Hall was previously convicted of a felony and under sentence of imprisonment; (2) Hall was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (3) the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; (4) the murder was especially heinous, atrocious or cruel; and (5) the victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties, which was merged with aggravator number 3.  Three of these aggravators are established without a factual determination by the jury, but the remaining aggravators each required factual findings that, under Hurst, must now be considered and weighed by a jury.  As we stated in Hurst, without an interrogatory verdict, we cannot determine which aggravators the jury unanimously found beyond a reasonable doubt.  See Hurst, 202 So. 3d at 67.

In Hurst, we declined to speculate why the jurors voted the way they did, yet because here the jury vote was unanimous, the majority is comfortable determining that "it is inconceivable that a jury would not have found the aggravation in Hall's case unanimously, especially given the fact that three of the aggravators found were automatic." Maj. op. at 61.  Even though the jury unanimously recommended the death penalty, whether the jury unanimously found each aggravating factor remains unknown.

The majority's reweighing of the evidence to support its conclusion is not an appropriate harmless error review. The harmless error review is not a sufficiency of the evidence test and the majority's analysis should instead focus on the effect of the error on the trier of fact. See State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). By ignoring the record and concluding that all aggravators were unanimously found by the jury, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against in Hurst v. Florida. See Hurst v. Florida, 136 S. Ct. at 622. Because the harmless error review is not a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," DiGuilio, 491 So. 2d at 1139, I conclude that the error here was harmful.

Two Cases:

An Appeal from the Circuit Court in and for Volusia County,
        Joseph David Walsh, Judge - Case No. 642008CF033412XXXAES
And an Original Proceeding – Habeas Corpus

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, Middle Region, and Ann Marie Mirialakis, Richard Edward Kiley, and Ali Andrew Shakoor, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

        for Appellee/Respondent